UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

NAHSHON JACKSON,

                              Plaintiff,             9:02-CV-0773
                                                 (GLS/GHL)

       v.

THOMAS RICKS, Warden, Upstate Correctional Facility;
ANTHONY BOUCAUD, Deputy Warden of Admin.,
Upstate Correctional Facility; GEORGE B. DUNCAN,
Warden, Great Meadow Correctional Facility; CHRISTINE
CHAPMAN, Corrections Counselor, Great Meadow
Correctional Facility; LEONARD A. PORTUONDO,
Warden, Shawangunk Correctional Facility; LYNN A.
BRIGG; DANIEL J. CONNELLY; EVAN GORELICK;
JOHN MALY; PETER M. HORAN; LEO J. BISCEGLIA;
CHRISTOPHER J. SEGER,

                              Defendants.

_____

APPEARANCES:                             OF COUNSEL:

NAHSHON JACKSON, 95-A-2578
  Plaintiff, *Pro Se*
Attica Correctional Facility
Box 149
Attica, New York 14011-0149

HON. ELIOT L. SPITZER               BRIDGET E. HOLOHAN, ESQ.
Attorney General of the State of New York    Assistant Attorney General
  Attorney for the Defendants
The Capitol
Albany, New York 12224

GEORGE H. LOWE, United States Magistrate Judge[1]

_____

      [1]     I would like to thank my summer intern, Brad M. Gallagher, currently a third-year law student at Syracuse University College of Law, who assisted in the researching and writing of this Report-Recommendation.

1

## ORDER AND REPORT RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c).

In his *pro se* civil rights complaint brought under 42 U.S.C. § 1983, Inmate Nahshon Jackson ("Plaintiff") alleges that twelve correctional personnel from three New York State correctional facilities (collectively "Defendants") violated his constitutional rights.  More specifically, Plaintiff alleges that Defendants violated his First, Fourth, Thirteenth, and/or Fourteenth Amendment rights through their conduct, between approximately December 24, 1999, and May 8, 2002, at Upstate Correctional Facility ("Upstate C.F."), Great Meadow Correctional Facility ("Great Meadow C.F."), and Shawangunk Correctional Facility ("Shawangunk C.F."), regarding Plaintiff's superintendent hearings, grievance appeals, confinement and conditions in a Special Housing Unit ("S.H.U."), incoming correspondence, and both urinalysis and DNA testing procedures.  (Dkt. No. 1.)

Currently before the Court are (1) Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 71), which Plaintiff has opposed (Dkt. No. 77), and (2) Plaintiff's cross-motion for an order compelling the depositions of Defendants, granting sanctions against Defendants, and appointing counsel for Plaintiff (Dkt. No. 77).  For the reasons discussed below, I deny Plaintiff's cross-motion, and recommend that Defendants' motion be granted.

**TABLE OF CONTENTS**

I.      BACKGROUND.................................................................................4
II.     SUMMARY JUDGMENT STANDARD.............................................7
III.    STATEMENT OF MATERIAL FACTS............................................9
IV.     ANALYSIS......................................................................................36
        A.      Plaintiff's Claims Regarding His Upstate C.F. Disciplinary Hearing and S.H.U.
                Confinement........................................................................36
                1.      Whether Plaintiff Has Established the Personal Involvement of
                        Defendant Ricks...............................................................37
                2.      Whether Plaintiff Has Established a Protected Liberty Interest with
                        Regard to His S.H.U. Confinement...................................39
                3.      Whether Plaintiff Was Afforded All the Process He Was Due...............42
                4.      Whether Defendants Ricks and Boucaud Are Entitled to Qualified
                        Immunity...........................................................................45
        B.      Plaintiff's Claims Arising from the Collection of His DNA Sample....................47
                1.      Whether Plaintiff Is Estopped from Bringing this Action.......................48
                2.      Whether Plaintiff Has Established that the Collection of His Blood
                        Sample Violated His Constitutional Rights........................51
                3.      Whether Defendants Chapman and Duncan Are Entitled to Qualified
                        Immunity...........................................................................52
        C.      Plaintiff's Claims Arising from the Collection of His Urine Sample..................53
                1.      Whether Plaintiff Has Established the Personal Involvement of
                        Defendant Duncan.............................................................53
                2.      Whether Plaintiff Has Established an Equal Protection Claim...............55
                3.      Whether Plaintiff Has Established a Privacy Claim.............................56
                4.      Whether Defendant Duncan Is Entitled to Qualified Immunity...............57
        D.      Plaintiff's Claims that He Was Subjected to Involuntary Servitude.................58
                1.      Whether Plaintiff Has Established a Claim for Involuntary
                        Servitude............................................................................58
                2.      Whether Defendant Portuondo Is Entitled to Qualified Immunity.........59
        E       Plaintiff's Claim Regarding the Inspection of His Incoming Mail.....................59
                1.      Whether a Violation of the First Amendment Occurred........................60
                2.      Whether Plaintiff Has Established the Personal Involvement of
                        Defendants Portuondo, Gorelick, Connolly, Horan, and Seger...............61
                3.      Whether Defendants Portuondo, Gorelick, Connolly, Horan, and Seger
                        Are Entitled to Qualified Immunity....................................62
        F.      Plaintiff's Claims Regarding the Review of His Disciplinary Conviction for
                Refusing to Submit a Urine Sample.....................................63
                1.      Whether Plaintiff Has Established a Claim Regarding the Review of His
                        Disciplinary Hearing Determination or His Grievance........................63
                2.      Whether Defendants Bisceglia, Maly, and Briggs Are Entitled to
                        Qualified Immunity............................................................64

## I.      BACKGROUND

Liberally construed, Plaintiff's *pro se* civil rights Complaint alleges the following:

(1)      **Defendant Thomas Ricks**, Superintendent of Upstate C.F., deprived Plaintiff of his Fourteenth Amendment right of due process by: (a) authorizing an improper superintendent's hearing at Upstate C.F.; and (b) creating a policy that authorized inmates to be improperly admitted to Upstate C.F.'s S.H.U. upon transfer from another facility;

(2)      **Defendant Anthony Boucaud**, a Correction Counselor at Upstate C.F., deprived Plaintiff of his Fourteenth Amendment right of due process by: (a) continuing to participate in a disciplinary proceeding at Upstate C.F. after learning that Defendant Ricks lacked jurisdiction to conduct that hearing; (b) retaliating against Plaintiff (for exercising his First Amendment right of freedom of speech) by using Plaintiff's published writings on government policies as evidence to determine Plaintiff's guilt and punishment; and (c) unlawfully sentencing Plaintiff to 360 days in Upstate C.F.'s S.H.U. under conditions that imposed an atypical and significant hardship;

(3)      **Defendant George B. Duncan**, Superintendent of Great Meadow C.F., deprived Plaintiff of his Fourth and Fourteenth Amendment rights of due process, equal protection, and/or privacy by creating, and continuing, policies that improperly: (a) authorized Rastafarians to be ordered to submit urine specimens; (b) authorized Black and West Indian prisoners at Great Meadow C.F. to be singled out for treatment different from other white inmates; and (c) compelled inmates to submit to DNA testing without a certified copy of a judicial record of conviction and judgment of a state court;

(4)      **Defendant Christine Chapman**, a Corrections Counselor at Great Meadow C.F., deprived Plaintiff of his Fourth and Fourteenth Amendment right of privacy and due process by

compelling Plaintiff to submit to an optional DNA test;

     (5)     **Defendant Leonard A. Portuondo**, Superintendent at Shawangunk C.F., denied Plaintiff: (a) his Thirteenth and Fourteenth Amendment right to be free from involuntary servitude, and his right of due process by creating, and continuing, a policy that accepts inmates into custody for detention, without an order of commitment from a state court; and (b) his First and Fourteenth Amendment right to associate and communicate with the outside world by creating, and continuing, a policy that arbitrarily restricted Plaintiff's incoming correspondence without due process.

     (6)     **Defendant Evan Gorelick** (Deputy Superintendent at Shawangunk C.F.), **Defendant Daniel J. Connolly** (Correction Captain at Shawangunk C.F.), **Defendant Peter M. Horan** (Senior Correction Counselor at Shawangunk C.F.), and **Defendant Christopher J. Seger** (Correction Officer at Shawangunk C.F.) deprived Plaintiff of his First and Fourteenth Amendment right to associate and communicate with the outside world by creating, and continuing, a policy that arbitrarily restricted Plaintiff's incoming correspondence without due process; and

     (7)     **Defendant Leo J. Bisceglia** (Deputy Superintendent of Administration at Shawangunk C.F.), **Defendant John Maly** (Deputy Superintendent of Security at Shawangunk C.F.), and **Defendant Lynn A. Briggs** (Secretary II at Shawangunk C.F.) deprived Plaintiff of his First Amendment right to (a) have a disciplinary hearing determination reviewed by Defendant Portuondo, and (b) have a grievance appeal reviewed by Defendant Portuondo. (*See* Dkt. No. 1 [Complaint].)

Generally, Defendants' motion for summary judgment raises six issues: (1) whether Plaintiff had a protected liberty interest in his S.H.U. confinement and was provided all process that he was due; (2) whether Plaintiff's Fourth Amendment rights were violated through the collection of his blood sample for DNA testing and the inclusion of the sample in the State DNA database; (3) whether Plaintiff's Fourth and Fourteenth Amendment rights were violated through the collection of his urine sample for urinalysis testing following a "family day" event at Great Meadow C.F.; (4) whether Plaintiff's Thirteenth Amendment rights were violated as a result of involuntary servitude; (5) whether Plaintiff's First Amendment rights were violated through the inspection of his incoming mail; and (6) whether Plaintiff's rights were violated regarding the discretionary review of the penalty at his disciplinary hearing or the denial of his subsequent grievance.  (Dkt. No. 71, Part 68 [Defs.' Mem. of Law].)

For the reasons discussed below, I reach the following conclusions: (1) Plaintiff was provided all process that he was due with respect tp his alleged liberty interest in his S.H.U. confinement; (2) Plaintiff's Fourth Amendment right was not violated through the collection of his blood sample for DNA testing and inclusion of the sample in the State DNA database; (3) Plaintiff's Fourth and Fourteenth Amendment rights were not violated through the collection of his urine sample for urinalysis testing following a family day event; (4) Plaintiff's Thirteenth Amendment right was not violated as a result of involuntary servitude; (5) Plaintiff's First Amendment right was not violated through the inspection of his incoming mail; and (6) Plaintiff's rights were not violated regarding the discretionary review of the penalty at his disciplinary hearing or the denial of his subsequent grievance.

## II.    SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is warranted if "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether a

genuine issue of material[2] fact exists, the Court must resolve all ambiguities and draw all

reasonable inferences against the moving party.  *Schwapp v. Town of Avon*, 118 F.3d 106, 110

(2d Cir. 1997) (citation omitted); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990)

(citation omitted).

However, when the moving party has met its initial burden of establishing the absence of

any genuine issue of material fact, the nonmoving party must come forward with "specific facts

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The nonmoving party must

do more than "simply show that there is some metaphysical doubt as to the material facts."

*Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986).  "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Ross v. McGinnis*, 00 Civ. 0275, 2004 WL

1125177, at *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with

which the Court must view a *pro se* plaintiff's pleadings.  "[I]n actions in which one of the

---

[2]      A fact is "material" only if it would have some effect on the outcome of the suit.
*Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

parties appears *pro se,* this Court is faced with the . . . responsibility of granting significant

liberality in how *pro se* pleadings are construed."  *Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 460,

467 (S.D.N.Y. 1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se*

pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v.

Cornetta,* 867 F.2d 146, 148 (2d Cir. 1989).  For example, where a plaintiff is proceeding *pro se,*

and the defendant has filed a dispositive motion, the Court must construe the plaintiff's

complaint and opposition papers liberally so as to raise the strongest arguments that they suggest.

*See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir. 2002) (motion to

dismiss in civil rights case); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (motion for

summary judgment in civil rights case); *Thomas v. Irving,* 981 F. Supp. 794, 799 (W.D.N.Y.

1997) (motion for summary judgment in civil rights case).

However, although "[t]he work product of *pro se* litigants should be generously and

liberally construed, . . . [a *pro se* litigant's] failure to allege either specific facts or particular laws

that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh

v. TRW, Inc.*, No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).  In other

words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to

survive a motion for summary judgment." *Bussa v. Aitalia Line Aeree Italiane S.p.A.*, 02-CV-

10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) (citations omitted); *accord, Durran v.

Selsky*, 251 F. Supp.2d 1208, 1211 (W.D.N.Y. 2003) (citations omitted).

## III.    STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be

taken as true to the extent those facts are supported by the evidence in the record[3] and are not

specifically controverted by the plaintiff.[4]

To "specifically controvert[]" each of the statements of material fact in a defendant's

Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of

Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or

denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth

a specific citation to the record where the factual issue arises."[5]

---

[3]        *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, No. 03-7030, 2004 WL
1472675, *3 (2d Cir. July 1, 2004) (citations omitted).

[4]        *See* Local Rule 7.1(a)(3) ("<u>Any facts set forth in the Statement of Material Facts</u>
<u>shall be deemed admitted unless specifically controverted by the opposing party</u>.") [emphasis in
original].

[5]        Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.*, 309 F.
Supp.2d 343, 346 (N.D.N.Y. 2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide
specific references to the record in support of her denials or has otherwise failed to completely
deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso*, 97-
CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.)
("Plaintiff does not offer any facts to support his claims that would raise an issue of fact.  Nor has
he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement.  Therefore,
Defendants' version of the facts remains uncontroverted."); *Margan v. Niles*, 250 F. Supp.2d 63,
67 (N.D.N.Y. 2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous
denials, does not contain a single citation to the record.  Because plaintiff's response Rule
7.1(a)(3) statement does not comply with the local rules, it has not been considered.");
*Mehlenbacher v. Slafrad*, 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4,
2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of
material fact, the facts as set forth in the defendants' Rule 7.1 Statement . . . are accepted as
true."); *Adams v. N.Y. State Thruway Auth.*, 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n.1
(N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local
Rule 7.1, and are not properly admitted or denied, the Court will deem defendant's statement of

Portions of the record sufficient to create a "factual issue" include affidavits or a verified complaint.[6]  However, such an affidavit or verified complaint must, among other things, be based "on personal knowledge."[7]  An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere suspicion, rumor, hearsay, or secondhand information.[8]  Similarly, such an affidavit or verified complaint must not be general and conclusory.[9]

Here, Plaintiff submits a verified letter to the Court responding to Defendants' legal

---

fact admitted by plaintiff.").

[6]      *See Patterson v. County of Oneida*, 375 F.2d 206, 219 (2d. Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") (citations omitted); Fed. R. Civ. P. 56(c) ("The judgment sought shall be rendered forthwith if the . . . affidavits . . . show that there is no genuine issue as to any material fact . . . .").

[7]      Fed. R. Civ. P. 56(e) (requiring "personal knowledge"); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995) (citations omitted), *cert. denied sub nom*, *Ferrante v. U.S.*, 516 U.S. 806 (1995).

[8]      *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 97 (2d Cir. 1970) (rejecting affidavit made on "suspicion . . . rumor and hearsay"); *Spence v. Maryland Cas. Co.*, 803 F. Supp. 649, 664 (W.D.N.Y. 1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd*, 995 F. 2d 1147 (2d Cir. 1993).

[9]      *See Patterson v. County of Oneida*, 375 F.2d 206, 219 (2d. Cir. 2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") (citations omitted); *West-Fair Elec. Contractors v. Aetna Cas. & Sur.*, 78 F.3d 61, 63 (2d Cir. 1996) (rejecting "conclusory" statements in opposing affidavit); *Applegate*, 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings"); Fed. R. Civ. P. 56(e) (requiring more than "mere allegations or denials of . . . [a pleading] . . . but . . . specific facts showing that there is a genuine issue for trial").

arguments and statements of fact.  (Dkt. No. 17.)  However, that verified letter does not satisfy

the requirements of Rule 7.1(a)(3) in that it *neither* "mirror[s] the movant's Statement of

Material Facts by admitting and/or denying each of the movant's assertions in matching

numbered paragraphs" *nor* "set[s] forth a specific citation to the record where the factual issue

arises."  As a result, to the extent Defendants' statements of fact are material, those statements

are deemed admitted.  The following material facts, even when viewed most favorably to

Plaintiff, are supported by evidence in the record, and are not specifically controverted by

Plaintiff:[10]

---

[10]     In various of the following footnotes, I cite Plaintiff's Complaint not as evidence (which it is not, since that Complaint is not verified), but simply to show that Plaintiff has acknowledged the referenced fact by alleging it.  Furthermore, in the following footnotes, I generally do not cite to Defendants' Amended Rule 7.1 Statement since the more significant citations are those to the evidence in the record; similarly, I generally do not cite to Plaintiff's Response, since it is so deficient for purposes of Rule 7.1(a)(3).

Finally, I note that several of Defendants' affidavits and affirmations are unsigned and unverified (e.g., they do not contain language that is in substantial compliance with 28 U.S.C. § 1746 because they do not state that the affirmation is made "under penalty of perjury").  (Dkt. No. 71, Part 7 [Bisceglia Aff.]; Dkt. No. 71, Part 19 [Briggs Aff.]; Dkt. No. 71, Part 22 [Chapman Aff.]; Dkt. No. 71, Part 24 [Conolly Aff.]; Dkt. No. 71, Part 27 [Duncan Aff.]; Dkt. No. 71, Part 31 [Gorelick Aff.]; Dkt. No. 71, Part 37 [Kelly Aff.]; Dkt. No. 71, Part 50 [Maly Aff.]; Dkt. No. 71, Part 52 [Portuondo Aff.]; Dkt. No. 71, Part 62 [Ricks Aff.]; Dkt. No. 71, Part 66, ¶ 7 [Seger Aff.].)  I exercise my discretion to nonetheless consider the affidavits and affirmations, since Plaintiff did not challenge the lack of signatures and verifications.  *See U.S. v. Dibble*, 429 F.2d 598, 603 (9th Cir. 1970) (concurring opinion) (citing cases); *Cinocca v. Baxter Lab., Inc.*, 400 F. Supp. 527, 530 (D. Okl. 1975); *Jno. T. McCoy, Inc. v. Schuster*, 44 F. Supp. 499, 499 (S.D.N.Y. 1942).  In his opposition papers, Plaintiff challenges only Attorney Holohan's affidavit, which is in fact signed, *electronically*, as indicated by the mark "s/", and is verified.  (Dkt. No. 77 [Plf.'s Response]; Dkt. No. 71, Part 3 [Holohan Aff.].)  *See* N.D.N.Y. General Order 22 6.1 ("Attorney Signatures").

1.     Plaintiff Nashon Jackson is an African-American inmate in the custody of the

New York Department of Correctional Services ("DOCS").[11]  Plaintiff has been in DOCS

custody since January of 1995.[12]

### February 10, 1999, to March 3, 2000
### Events at Green Haven C.F. and Upstate C.F.
### (Y2K Work Stoppage)

2.     In June of 1995, Plaintiff was transferred from Downstate Correctional Facility to

Green Haven C.F.[13]

3.     From approximately February 10, 1999, through December 24, 1999, Plaintiff was

on a "TB hold" (mycobacterium tuberculosis) for refusing to comply with the DOCS testing and

inoculation requirements.[14]

4.     In or around April 1999, correctional personnel at Green Haven C.F. began

investigating a planned labor strike scheduled for January 1, 2000, to occur at Green Haven

C.F.[15]

5.     On December 24, 1999, at approximately 12:45 p.m., Correction Officer G.

Williams ("C.O. Williams") signed an Inmate Misbehavior Report that identified Plaintiff as

---

[11]     (Dkt. No. 73, Part 2, ¶ 1 [Defs.' Amended Rule 7.1 Statement]; Dkt. No. 77 [Plf.'s Response]; *see also* Dkt No. 1, ¶ 1 [Complaint].)

[12]     (Dkt. No. 71, Part 23 [Ex. A to Chapman Aff.].)

[13]     (Dkt. No. 71, Part 63 [Ex. A to Ricks Aff.].)

[14]     (Dkt. No. 73, Part 2, ¶ 5 [Defs.' Amended Rule 7.1 Statement]; Dkt. No. 71, Parts 12-13 at 18, 31 [Exs. A and B to Boucaud Aff.]; *see also* Dkt. No. 1, ¶ 15 [Complaint].)

[15]     (Dkt. No. 71, Part 12 at 19 [Ex. A to Boucaud Aff.]; Dkt. No. 71, Part 64 [Ex. A to Ricks Aff.].)

having violated Rule 104.12 of the Standards of Inmate Behavior.[16]  Rule 104.12 prohibits inmates from "lead[ing], organiz[ing], participat[ing] or urg[ing] other inmates to participate in, work-stoppages, sit-ins, lock-ins, or other action which may be detrimental to the order of the facility."[17]  Specifically, C.O. Williams stated, "As a result of an ongoing investigation into a planned inmate labor strike on or about 1-1-00, Inmate Jackson has been identified as having violated the above rule by urging other inmates to participate in the planned strike."[18]

6.      On or about December 24, 1999, Plaintiff was transferred from Green Haven C.F., and on or about December 25, 1999, Plaintiff arrived at Upstate C.F., where he was admitted to a Special Housing Unit ("S.H.U.").[19]  Upstate C.F. contains only Special Housing Units.[20]

7.      On December 30, 1999, and on January 6, 2000, Defendant Boucaud presided over a disciplinary hearing regarding the Inmate Misbehavior Report filed on December 24, 1999.[21]  During the hearing, C.O. Williams testified that Plaintiff had been identified by a

---

[16]      (Dkt. No. 71, Part 64 [Ex. B to Ricks Aff.]; *see also* Dkt. No. 1, ¶ 14 [Complaint].)

[17]      (Dkt. No. 71, Part 64 [Ex. B to Ricks Aff.].)  *See also* 7 N.Y.C.R.R. § 270.2(B)(5)(iii).

[18]      (Dkt. No. 71, Part 64 [Ex. B to Ricks Aff.]; *see also* Dkt. No. 1, ¶ 14 [Complaint].)

[19]      (Dkt. No. 71, Part 62, ¶ 8 [Ricks Aff.]; Dkt. No. 71, Part 63 [Ex. A to Ricks Aff.]; *see also* Dkt. No. 1, ¶ 17, 19 [Complaint].)

[20]      (Dkt. No. 71, Part 62, ¶ 8 [Ricks Aff.].)

[21]      (Dkt. No. 71, Part 79, ¶ 3 [Boucaud Aff.]; Dkt. No. 71, Part 12 [Ex. A to Boucaud Aff.]; *see also* Dkt. No. 1, ¶ 24 [Complaint].)

confidential informant.[22]  Because of confidentially concerns, C.O. Williams could not specify

where or when the confidential informant had identified Plaintiff.[23]  Rather, C.O. Williams

testified that Plaintiff was identified as having violated Rule 104.12 at various times since the

start of the labor-strike investigation in April of 1999, in part through his conspiring with other

inmates and propagating certain materials that Plaintiff had written while located in the facility's

"physical plant" (prior to the start of his medical confinement on or about February 10, 1999).[24]

While C.O. Williams did not offer these particular materials into evidence (apparently due to

confidentiality concerns), he offered two analogous documents, which he characterized as

"subversive."[25]

       8.     The first document--an 18-page manifesto dated June 28, 1998, and signed by

Plaintiff--contained, among other things, complaints regarding the conditions of confinement and

work at New York State correctional facilities, and in particular Green Haven C.F., and calling

for others to join him in taking certain actions to end the referenced conditions.[26]  The second

---

[22]     (Dkt. No. 71, Part 12 [Ex. A to Boucaud Aff.]; *see also* Dkt. No. 1, ¶ 27 [Complaint].)

[23]     (Dkt. No. 71, Parts 12-13 at 19, 22, 39 [Exs. A and B to Boucaud Aff.]; Dkt. No. 71, Part 16 at 2-3 [Ex. E to Boucaud Aff.]; Dkt. No. 71, Part 4 [Ex. A to Holohan Aff.]; *see also* Dkt. No. 1, ¶ 27 [Complaint].)

[24]     (Dkt. No. 71, Part 12 at 18-20 [Ex. A to Boucaud Aff.]; Dkt. No. 71, Part 4 [Ex. A to Holohan Aff.].)

[25]     (Dkt. No. 71, Part 4 [Ex. A to Holohan Aff.]; Dkt. No. 73, Part 3, ¶ 3 [Holohan Amended Aff.]; Dkt. No. 71, Parts 12-13 at 25-30 [Exs. A and B to Boucaud Aff.]; *see also* Dkt. No. 1, ¶ 28 [Complaint].)

[26]     (Dkt. No. 71, Part 15 [Ex. D to Boucaud Aff.]; *see also* Dkt. No. 1, ¶ 30 [Complaint].)

14

document--a two-page letter dated October 5, 1998, and signed by Plaintiff as the President of the Association for Community Teamwork, Inc. ("ACT")--solicited family members of other Green Haven C.F. inmates to assist ACT so that it may sue Green Haven C.F. officials for allegedly violating various civil rights during a Family Day Event held at the facility in 1998.[27]

9.      At some point between December 30, 1999, and January 6, 2000, Defendant Boucaud held part of Plaintiff's disciplinary hearing confidentially.[28]  One of the purposes of this confidential portion of the hearing, which was apparently held by telephone, was to question C.O. Williams regarding his confidential informant, to insure that the informant was reliable.[29] Among other things, C.O. Williams testified:

> [The confidential informant] asks nothing in return and leaves
> information at night.  He's 90 percent accurate and . . . it really wasn't
> necessary to even use [him] because [Plaintiff] . . . is known by both
> staff and inmates . . . to be . . . very smart [and] very well-written . . .
> who is . . . known for . . . fighting some sort of struggle . . . . [H]e's
> like the brains, while they would use gang members as the brawn. . . .
> [H]is position in this work stoppage that we are now experiencing at
> the prison . . . was [as] a ghostwriter. . . .  [H]e prepared documents.
> He had outside contacts . . . .[30]

In addition, C.O. Williams made clear that he had been using "the informant since [redacted

---

27      (Dkt. No. 71, Part 14 [Ex. C to Boucaud Aff.]; *see also* Dkt. No. 1, ¶ 29 [Complaint].)

28      (Dkt. No. 73, Part 3, ¶ 3 [Holohan Amended Aff.]; Dkt. No. 71, Part 4 [Ex. A to Holohan Aff.]; Dkt. No. 71, Part 16 [Ex. E to Boucaud Aff.]; Dkt. No. 71, Part 13 at 49 [Ex. B to Boucaud Aff.]; *see also* Dkt. No. 1, ¶ 32 [Complaint].)

29      (Dkt. No. 73, Part 3, ¶ 3 [Holohan Amended Aff.]; Dkt. No. 71, Part 4 [Ex. A to Holohan Aff.]; Dkt. No. 71, Part 16 [Ex. E to Boucaud Aff.]; Dkt. No. 71, Part 13 at 49 [Ex. B to Boucaud Aff.].)

30      (Dkt. No. 71, Part 4 [Ex. A to Holohan Aff.].)

date] and the informant has been reliable in the past."[31]

10.     On January 6, 2000, Defendant Boucaud found Plaintiff guilty of violating Rule

104.12 based upon "[t]he testimony of [Corrections Officer] Williams that his sources were

<u>reliable</u> and [Plaintiff] was involved in a series of incidents involving the promotion of an inmate

labor strike for January 1, 2000."[32]  Defendant Boucaud sentenced Plaintiff to (1) 360 days in

S.H.U., (2) twelve months' loss of packages, commissary, and phone privileges, and (3) twelve

months' loss of good time credits.[33]

11.     On January 10, 2000, Plaintiff filed a grievance (Grievance No. UST-2615-00),

challenging his admission to S.H.U. on the grounds that (1) "[t]here was never a disposition

pursuant to a Superintendent's hearing at Green Haven [C.F.] to be carried out in Upstate [C.F.]"

and (2) "Upstate [C.F.] lack[ed] jurisdiction to conduct a [S]uperintendent's hearing [on] the

12/24/99 [Inmate Misbehavior] [R]eport written by C.O. Williams."[34]

12.     At some point between January 6, 2000, and March 3, 2000, Plaintiff's grievance

was denied and Plaintiff appealed that denial to Defendant Ricks.[35]

---

[31]     (*Id.*)

[32]     (Dkt. No. 71, Part 16 [Ex. E to Boucaud Aff.] [emphasis in original]; Dkt. No. 71, Part 13 at 49 [Ex. B to Boucaud Aff.]; *see also* Dkt. No. 1, ¶ 32 [Complaint].)

[33]     (Dkt. No. 71, Part 16 [Ex. E to Boucaud Aff.]; Dkt. No. 71, Part 13 at 49 [Ex. B to Boucaud Aff.]; *see also* Dkt. No. 1, ¶ 34 [Complaint].)

[34]     (Dkt. No. 71, Part 65 [Ex. C to Ricks Aff.]; *see also* Dkt. No. 1, ¶¶ 39-40 [Complaint].)

[35]     (Dkt. No. 71, Part 62, ¶ 11 [Ricks Aff.]; Dkt. No. 71, Part 65 at 2 [Ex. C to Ricks Aff.].)

13.     On March 3, 2000, Defendant Ricks denied Plaintiff's January 10, 2000, grievance (Grievance No. UST-2615-00) because (1) DOCS regulations permit detention admissions where an inmate is awaiting initial appearance at a disciplinary or superintendent's hearing, and (2) a grievance was the incorrect mechanism through which to bring Plaintiff's complaint (i.e., disciplinary proceedings have their own appeals process).[36]

14.     Meanwhile, at some point between January 6, 2000, and February 18, 2000, Plaintiff wrote a letter to DOCS appealing the disciplinary hearing determination rendered by Defendant Boucaud on January 6, 2000.[37]

15.     On February 18, 2000, the disciplinary hearing determination rendered by Defendant Boucaud on January 6, 2000, was administratively reversed by Donald Selsky, Director of DOCS Special Housing / Inmate Disciplinary program.[38]  Although the document communicating this reversal does not indicate the grounds for the reversal, it appears that those grounds were a failure to independently assess the confidential informant's reliability.[39]  In response to the reversal, Defendant Boucaud has sworn:

> At the time I conducted the disciplinary hearing on January 6, 2000, I reasonably and in good-faith believed that I did not have to

---

[36]     (Dkt. No. 71, Part 65 at 2 [Ex. C to Ricks Aff.]; Dkt. No. 71, Part 62, ¶¶ 13-15, 18 [Ricks Aff.].)  *See also* 7 N.Y.C.R.R. § 301.3(a)(1).

[37]     (Dkt. No. 71, Part 17 [Ex. F to Boucaud Aff.]; *see also* Dkt. No. 1, ¶ 37 [Complaint].)

[38]     (Dkt. No. 71, Part 17 [Ex. F to Boucaud Aff.]; *see also* Dkt. No. 1, ¶ 37 [Complaint].)

[39]     (Dkt. No. 71, Part 17 [Ex. F to Boucaud Aff.]; Dkt. No. 71, Part 79, ¶ 18 [Boucaud Aff.].)

independently assess a confidential informant's reliability under the Due Process Clause. . . .  In fact, I reasonably and in good-faith believed I could rely on testimony provided by a correction officer regarding an inmate's reliability. . . .  At all times, I reasonably believed that I was acting in accordance with all federal and state laws.[40]

16.     On March 1, 2000, Plaintiff was transferred from Upstate C.F. to Great Meadow C.F. after spending 67 days in S.H.U. confinement.[41]

**July 16, 1999, to December 11, 2000**
**Events at Great Meadow C.F.**
**(Drug Test)**

17.     On or about July 16, 1999, W.E. Phillips, a Deputy Superintendent of Security at Great Meadow C.F., sent a memorandum to Defendant Duncan regarding urinalysis testing at Great Meadow C.F.[42]  Among other things, the memorandum: (1) reported that urinalysis testing conducted after a prison "family day event" on June 26, 1999, revealed that approximately 25% of the inmates attending the event tested positive for illegal drug use; (2) recommended that the prison continue to drug test inmates after family events in compliance with DOCS Directive 4937; but (3) advised that the cost of implementing such a policy could be high.[43]

18.     DOCS Directive 4937 provides, among other things, that "[u]rinalysis testing of inmates shall be conducted . . . [p]rior to and after an inmate participates in a Family Reunion

---

[40]     (Dkt. No. 71, Part 79, ¶¶ 19-21 [Boucaud Aff.].)

[41]     (Dkt. No. 71, Part 63 [Ex. A to Ricks Aff.];  *see also* Dkt. No. 1, ¶ 38 [Complaint].)

[42]     (Dkt. No. 71, Part 28, [Ex. A to Duncan Aff.].)

[43]     (Dkt. No. 71, Part 28, [Ex. A to Duncan Aff.].)

Program visit. . . . [or] as part of a random urinalysis testing program on any identifiable unit of

the facility, or any identifiable program area, or on any identifiable group of inmates."[44]

19.    At some point between July 16, 1999, and November 11, 2000, a policy was

enacted to randomly drug test all inmates who participated in family day events.[45]  The purpose

of the drug test was to combat illegal drug use by inmates, which threatens the safety and security

of a maximum security prison such as Great Meadow C.F.[46]  However, due to financial and

staffing concerns, random drug testing was not performed following every family day event.[47]

20.    On November 11, 2000, Plaintiff attended a Rastafarian Religious Family Day

event at Green Meadow C.F.[48]

21.    On or about November 12, 2000, thirty-three (33) of the fifty-two (52) participants

in the Rastafarian Family Day Event, including Plaintiff, were chosen to submit to urinalysis

testing for suspicion of illegal drugs and alcohol.[49]  The results of Plaintiff's drug test were

---

[44]    (Dkt. No. 71, Part 38 [Ex. A to Kelly Aff.] [attaching DOCS Directive 4397, § IV-A-6, 7].)

[45]    (Dkt. No. 71, Part 27, ¶ 7 [Duncan Aff.].)

[46]    (Dkt. No. 71, Part 27, ¶¶ 6-7 [Duncan Aff.].)

[47]    (Dkt. No. 71, Part 27, ¶ 8 [Duncan Aff.].)

[48]    (Dkt. No. 71, Part 37, ¶ 4 [Kelly Aff.]; Dkt. No. 71, Part 39 [Ex. B to Kelly Aff.]; *see also* Dkt. No. 1, ¶ 42 [Complaint].)

[49]    (Dkt. No. 71, Part 37, ¶¶ 5-7 [Kelly Aff.]; Dkt. No. 71, Part 39 [Ex. B to Kelly Aff.].)  Plaintiff alleges, in his unverified Complaint, that "every Rastafarian who attended the event" was ordered to submit urinalysis testing.  (Dkt. No. 1, ¶ 43 [Complaint].)  However, Plaintiff produces no evidence in support of this allegation.  Moreover, Plaintiff does not even specifically controvert Defendants' factual assertion (that only 33 of the 52 participants in the Family Day Event were tested) in his response papers.  (Dkt. No. 77 [Plf.'s Response].)

negative, meaning that he was not found to have used drugs or alcohol.[50]

22.    On or about November 16, 2000, Plaintiff filed a grievance (Grievance No. GM-31045-00), alleging that Black and West Indian prisoners at Great Meadow C.F. had been discriminated against when they were singled out for urinalysis testing following their attendance at the Rastafarian Family Day Event on November 11, 2000, as compared to certain other inmates ("white Italians"), who had not been not singled out for testing following their attendance at such family day events.[51]

23.    On December 6, 2000, Defendant Duncan denied Plaintiff's grievance (Grievance No. GM-31045-00).[52]   The stated grounds for this denial were that "the urinalysis test was conducted in accordance with Directive 4937."[53]   Defendant Duncan subsequently testified that what he meant by this statement was that "[random] drug testing [of the participants in the Rastafarian Family Day Event] was performed based on participation in the family day event and not based on race or religion."[54]   Defendant Duncan further testified that, contrary to Plaintiff's allegation, "there has not been an Italian Family Day Event at Great Meadow."[55]

---

[50]    (Dkt. No. 71, Part 37, ¶ 7 [Kelly Aff.]; Dkt. No. 71, Part 39 [Ex. B to Kelly Aff.]; *see also* Dkt. No. 1, ¶ 44 [Complaint].)

[51]    (Dkt. No. 71, Part 29 [Ex. B to Duncan Aff.];  *see also* Dkt. No. 1, ¶ 45 [Complaint].)

[52]    (Dkt. No. 71, Part 27, ¶ 12 [Duncan Aff.]; Dkt. No. 71, Part 30 [Ex. C to Duncan Aff.]; *see also* Dkt. No. 1, ¶ 47 [Complaint].)

[53]    (Dkt. No. 71, Part 30 [Ex. C to Duncan Aff.].)

[54]    (Dkt. No. 71, Part 27, ¶¶ 12-17 [Duncan Aff.].)

[55]    (Dkt. No. 71, Part 27, ¶ 16 [Duncan Aff.].)

24.     On December 11, 2000, Plaintiff apparently appealed Defendant Duncan's determination to DOCS' Central Office Review Committee ("C.O.R.C.").[56]   The stated grounds for this appeal were that "[t]here is no provision under Directive 4937 requiring every individual inmate to be tested for urinalysis after attending a family or religious event.   Moreover, a random urinalysis testing program under Section IV-A(7) was never read together with Section VIII-A, B, and was not applied harmoniously and consistently."[57]   None of the parties have indicated the disposition of that apparent appeal.

**July 3, 2001, to July 18, 2001**
**Events at Great Meadow C.F.**
**(DNA Test)**

25.     On July 3, 2001, Plaintiff was summoned to the Great Meadow Medical Unit and ordered to submit a blood sample for DNA testing and inclusion in a DNA database.[58]   At the time, Defendant Chapman was present at the Medical Unit in order to inform inmates who had been ordered to appear, such as Plaintiff, that they had been convicted of a qualifying crime under N.Y. Exec. Law § 995(7) and to answer any of their questions.[59]   Defendant Chapman informed Plaintiff that his conviction for murder in the second degree was a qualifying crime requiring the submission of his blood sample for DNA testing and inclusion in a DNA database.[60]   Plaintiff objected to the collection of his blood sample because Great Meadow C.F. did not have

---

[56]     (Dkt. No. 71, Part 30 [Ex. C to Duncan Aff.].)

[57]     (Dkt. No. 71, Part 30 [Ex. C to Duncan Aff.].)

[58]     (Dkt. No. 71, Part 22, ¶ 6 [Chapman Aff.]; *see also* Dkt. No. 1, ¶ 48 [Complaint].)

[59]     (Dkt. No. 71, Part 22, ¶¶ 4, 6 [Chapman Aff.].)

[60]     (Dkt. No. 71, Part 22, ¶ 7 [Chapman Aff.].)

21

a certified copy of his "certificate of conviction" on file.[61]  Defendant Chapman informed

Plaintiff that his file contained a copy of his "Sentence & Commitment" form, which had been

submitted by the trial court to DOCS.[62]  Defendant Duncan also advised Plaintiff that his

"Sentence & Commitment" form was sufficient to hold him in DOCS custody.[63]  Plaintiff then

submitted a blood sample for DNA testing and inclusion in the DNA database without further

incident.[64]  Plaintiff was not subjected to any disciplinary action as a result of his objection.[65]

26.     On July 9, 2001, Plaintiff filed a grievance (Grievance No. GM-31, 906-01),

alleging that he was compelled to submit to a DNA test against his legal right to abstain from

doing so.[66]  Specifically, in his grievance, Plaintiff alleged that he was not required to submit to

---

[61]     (Dkt. No. 71, Part 22, ¶ 8 [Chapman Aff.]; *see also* Dkt. No. 1, ¶¶ 51-52 [Complaint].)

[62]     (Dkt. No. 71, Part 22, ¶ 9 [Chapman Aff.]; Dkt. No. 71, Part 23 [Ex. A to Chapman Aff.]; *see also* Dkt. No. 1, ¶¶ 51-52 [Complaint].)

[63]     (Dkt. No. 71, Part 22, ¶ 10 [Chapman Aff.]; Dkt. No. 71, Part 23 [Ex. A to Chapman Aff.]; *see also* Dkt. No. 1, ¶ 54 [Complaint].)  I pause to note that, to the extent that Plaintiff alleges that Defendant Chapman informed him that no certificate of conviction, as defined by N.Y. Crim. Proc. Law § 380.60, existed on file at Great Meadow C.F. on July 3, 2001 (*see* Dkt. No. 1, ¶¶ 52, 54), I conclude that (1) that allegation, which is made in an unverified Complaint, lacks any evidentiary support in the record, and (2) Plaintiff has not even made such a factual assertion in his response papers (*see* Dkt. No. 77).

[64]     (Dkt. No. 71, Part 22, ¶ 11 [Chapman Aff.]; *see also* Dkt. No. 1, ¶ 56 [Complaint, alleging that Plaintiff did submit a blood sample].)

[65]     (Dkt. No. 71, Part 22, ¶ 12 [Chapman Aff.]; Dkt. No. 71, Part 5, [Ex. B to Holohan Aff.] [Grievance, not alleging that Plaintiff was disciplined as a result of his actions on July 3, 2001]; *see also* Dkt. No. 1, ¶¶ 55-57 [Complaint, not alleging that Plaintiff was disciplined as a result of his actions on July 3, 2001].)

[66]     (Dkt. No. 71, Part 5, [Ex. B to Holohan Aff.]; Dkt. No. 71, ¶ 47 [Def's Rule 7.1 Statement] [acknowledging that Plaintiff exhausted his administrative remedies before filing his Article 78 petition]; *see also* Dkt. No. 1, ¶ 56 [Complaint].)

DNA testing because Great Meadow C.F. did not have on file a "certificate of conviction," as that term is construed pursuant to N.Y. Crim. Proc. Law § 380.60.[67]

27.     On July, 18, 2001, Defendant Duncan denied Plaintiff's grievance.[68]  The stated grounds for this denial were that "CORC Response ONI-6586 affirms that anyone still serving a sentence of imprisonment on or after December 1, 1999, for any of the expanded list of crimes, must provide a DNA sample."[69]

28.     On or about July 19, 2001, Plaintiff appealed Defendant Duncan's decision to C.O.R.C.[70]  The stated grounds for the appeal were that "[t]he Superintendent denied Grievant's requested action without determining whether there exists a 'certificate of conviction' on file showing that Grievant is still serving a sentence of imprisonment on or after December 1, 1999, for any of the expanded list of crimes, for the purpose of providing a DNA sample."[71]

29.     On or about August 20, 2001, C.O.R.C. sent a letter to Plaintiff advising him that his appeal had been received on July 27, 2001, was being processed, and that "[a] copy of the disposition will be forwarded in the near future."[72]  However, it appears that C.O.R.C. never

---

[67]     (Dkt. No. 71, Part 5 [Ex. B to Holohan Aff.]; *see also* Dkt. No. 1, ¶ 57 [Complaint].)

[68]     (Dkt. No. 71, Part 5 [Ex. B to Holohan Aff.]; *see also* Dkt. No. 1, ¶ 58 [Complaint].)

[69]     (Dkt. No. 71, Part 5 [Ex. B to Holohan Aff.]; *see also* Dkt. No. 1, ¶ 59 [Complaint].)

[70]     (Dkt. No. 71, Part 5 [Ex. B to Holohan Aff.].)

[71]     (Dkt. No. 71, Part 5 [Ex. B to Holohan Aff.].)

[72]     (Dkt. No. 71, Part 5 [Ex. B to Holohan Aff.].)

rendered, or forwarded, that decision.[73]

30.     At some point between September 12, 2001, and October 24, 2001, Plaintiff filed

an Article 78 petition in New York State court (Index No. 5502-01).[74]  In Plaintiff's Article 78

petition, he raised the same challenge to the taking of his DNA sample that he raises now in this

Section 1983 action--namely, that Great Meadow C.F. improperly collected his DNA sample

without having his certificate of conviction on file at the facility.[75]

31.     On or about January 12, 2002, the New York State Supreme Court issued a

written "Decision & Judgment" dismissing Plaintiff's petition on the merits.[76]  In its Decision &

Judgment, which was mailed to Plaintiff on January 12, 2002, and filed with the Albany County

Clerk's Office on February 6, 2002, the court held, in pertinent part:

> Petitioner does not dispute that he was convicted and sentenced to the
> crimes [of murder in the second degree and robbery in the first degree],
> however, argues that because no 'certificate of conviction' was on file,
> he could not be required to submit to a DNA test.  However, Executive

---

[73]     (Dkt. No. 71, Part 5 [Ex. B to Holohan Aff.].)

[74]     (Dkt. No. 71, Part 5 [Ex. B to Holohan Aff.] [petition is dated September 12, 2001; and memorandum of law in support of the petition--which memorandum is dated October 24, 2001, and bears the case's index number assigned by the court clerk--states that "[t]he petition and supporting papers were received by the office of Albany County Combined Courts on September 14, 2001"].)

[75]     (*Compare* Dkt. No. 71, Part 5 [Ex. B to Holohan Aff.] *with* Dkt. No. 1, ¶¶ 43-58 [Complaint].)

[76]     (Dkt. No. 71, Part 6 [Ex. C to Holohan Aff.]; Dkt. No. 71, Part 3, ¶¶ 3-4 [Holohan Aff.].)  I reject Plaintiff's assertion that he never "filed" his Article 78 petition with the New York State Supreme Court as conclusory and completely contradicted by the evidence.  (Dkt. No. 77 at 3 [Plf.'s Response].)  Similarly, I reject his assertion that the New York State Supreme Court's January 12, 2002, decision was not "filed" with the Albany County Clerk's Office as, again, conclusory and without any evidentiary support.  (Dkt. No. 77 at 4 [Plf.'s Response].)

> Law § 995 makes no such requirement.  The Correctional Facility's
> file regarding prisoner contains a "Sentence & Commitment" form
> which was issued by the trial court and provides presumptive evidence
> of the crime for which petitioner is being held in custody and which
> makes petitioner required to submit to DNA testing.  There is no
> statutory or constitutional requirement that a 'certificate of conviction'
> form be on file.[77]

Furthermore, after discussing the merits of Plaintiff's claims, the Decision & Judgment (1) held

that "[f]or the reasons stated above, the claims in the petition fail," (2) ordered and adjudged that

"the petition is dismissed," and (3) expressly stated that "[t]his constitutes the Decision &

Judgment of this Court."[78]

### August 2, 2001, to August 21, 2002
### Events at Shawangunk C.F.
### (Sentence & Commitment Form)

32.    On or before August 2, 2001, Plaintiff was transferred to Shawangunk C.F.[79]

33.    On or about August 8, 2001, a copy of Plaintiff's "Sentence & Commitment"

form was on file at Shawangunk C.F.[80]

34.    Apparently, on or about August 13, 2001, Plaintiff filed a grievance at

Shawangunk C.F. alleging that: (1) Shawangunk C.F. did not have on file a certified copy of

Plaintiff's "certificate of conviction" as defined under N.Y. Crim. Proc. Law § 380.60; and (2)

---

[77]    (Dkt. No. 71, Part 6 [Ex. C to Holohan Aff.].)

[78]    (Dkt. No. 71, Part 6 [Ex. C to Holohan Aff.].)

[79]    (Dkt. No. 73, Part 2, ¶ 51 [Defs.' Amended Rule 7.1 Statement, acknowledging the veracity of this factual allegation.]; *see also* Dkt. No. 1, ¶ 59 [Complaint].)

[80]    (Dkt. No. 77, Part 52, ¶¶ 10-13 [Portuondo Aff.]; Dkt. No. 77, Part 54 [Ex. B to Portuondo Aff.]; *see also* Dkt. No. 1, ¶ 60 [Complaint] [acknowledging fact].)

without such a "certificate of conviction," Defendant Portundo did not have the authority to punish or detain Plaintiff at Shawangunk C.F.[81]

35.     Apparently, on or about August 21, 2001, Defendant Portuondo either denied, or affirmed the denial of, Plaintiff's grievance on the grounds that there is no requirement that Shawangunk have an inmate's "certificate of conviction" on file if it has his "Sentence & Commitment" form on file, which Shawangunk did have on file for Plaintiff.[82]

**March 8, 2002, to March 27, 2002**
**Events at Shawangunk C.F.**
**(ACT Correspondence)**

36.     On March 8, 2002, Plaintiff was serving a period of confinement in S.H.U. at Shawangunk C.F.[83]  Plaintiff received a package from the Association of Community Teamwork, Inc. ("ACT").[84]

37.     At the time Plaintiff received the package, several DOCS Directives were in effect regulating inmates' correspondence.  For example, DOCS Directive 4933 provided, in pertinent

---

[81]     (Dkt. No. 77, Part 52, ¶ 10 [Portuondo Aff.]; *see also* Dkt. No. 1, ¶¶ 61-62 [Complaint]; Dkt. No. 24, ¶ 1 [Answer].)  None of the parties have provided the Court with a copy of this grievance.

[82]     (Dkt. No. 77, Part 52, ¶¶ 10-13 [Portuondo Aff.]; *see also* Dkt. No. 1, ¶ 64 [Complaint]; Dkt. No. 24, ¶ 3 [Answer].)  With regard to Plaintiff's other allegations concerning this grievance (i.e., that it was preceded by a Freedom of Information Act request, a memorandum from "P. Mitchetti," and an endorsed version of that memorandum) (Dkt. No. 1, ¶¶ 59, 60, 63), I find that: (1) those allegations lack any evidentiary support since Plaintiff makes them in an unverified Complaint and has not provided copies of the three alleged documents; and in any event (2) the alleged facts are immaterial to Defendants' motion.

[83]     (Dkt. No. 71, Part 66, ¶ 8 [Seger Aff.].)

[84]     (Dkt. No. 71, Part 66, ¶ 4 [Seger Aff.]; Dkt. No. 71, Part 67 [Ex. A to Seger Aff.]; Dkt. No. 1, ¶ 65 [Complaint].)

part, that "[n]o packages may be received at any time by an inmate in SHU except books,

periodicals, and legal materials, including envelopes."[85]  DOCS Directive 4422 provided, in

pertinent part, that "[a]ll incoming general correspondence will be opened and inspected for cash,

checks, money orders, printed or photocopied materials, or contraband."[86]  And DOCS Directive

4572 provided, in pertinent part, that publications received by inmates "should not incite

violence based on race, religion . . . creed, or nationality. . . .   Any publication which advocates

and presents a clear and immediate risk of lawlessness, violence, anarchy, or rebellion against

governmental authority is unacceptable. . . .   The publication should not incite disobedience

towards law enforcement officers or prison personnel."[87]

     38.    At the time Plaintiff received the package, Defendant Seger was on duty.[88]  One of

Defendant Seger's duties was to open and inspect inmates' incoming correspondence for, among

other things, printed or photocopied materials or contraband.[89]  Defendant Seger opened and

---

[85]    *See* DOCS Directive 4933, § V-J-3 (9/18/95) [emphasis in original].  (Dkt. No. 71, Part 66, ¶ 7 [Seger Aff.].)

[86]    *See* DOCS Directive 4422, § III-G-1 (10/02/00).

[87]    *See* DOCS Directive 4572, § II-C, D, E (8/2/96).

[88]    (Dkt. No. 71, Part 66, ¶¶ 2-5 [Seger Aff.].)

[89]    (Dkt. No. 71, Part 66, ¶ 3 [Seger Aff.].)  *See also* 7 N.Y.C.R.R. 720.1 ("The exchange of correspondence between an inmate and another person or business must be in accord with the regulations contained in this part."); 7 N.Y.C.R.R. § 720.02(a) ("These regulations are specified for staff . . . ."); 7 N.Y.C.R.R. § 720.02(f)(1) ("The superintendent shall have the overall responsibility for the administration of the correspondence program at his or her facility. Specific responsibilities may be delegated by the superintendent."); 7 N.Y.C.R.R. § 720.04(a)(2) ("All incoming general correspondence will be opened and inspected for cash, checks, money orders, printed or photocopied materials or contraband."); 7 N.Y.C.R.R. § 720.04(c) ("A limit of five pages of printed or photocopied materials . . . may be received within a piece of regular correspondence.").

inspected Plaintiff's incoming correspondence from ACT.[90]  Defendant Seger found

approximately 148 pages of photocopied materials.[91]  Specifically, the photocopied materials

included: (1) 29 copies of a form letter from ACT to "Family, Friend[s] or Community

Member[s]" soliciting them to "become a certified Associate of our Corporation"; (2) 38 copies

of a "Certificate of Appointment"; (3) 42 copies of a form letter from ACT to "Community of

Faith" soliciting "House[s] of God" to "join the struggle for righteousness" and "partake in this

historic movement" for "social, political and economic change"; and (4) 39 copies of a

"Certificate of Association."[92]

     39.    At some point between March 8, 2002, and March 11, 2002, Defendent Seger sent

Plaintiff's correspondence to Defendant Horan, Chairman of Media Review Committee ("MRC")

at Shawangunk C.F.[93]

     40.    On or about March 11, 2002, Defendant Horan received Plaintiff's

correspondence.[94]  Defendant Horan informed Plaintiff in writing that the correspondence

Plaintiff received from ACT was being reviewed by MRC.[95]  After reviewing the

---

[90]     (Dkt. No. 71, Part 66, ¶ 5 [Seger Aff.]; *see also* Dkt. No. 1, ¶ 65 [Complaint].)

[91]     (Dkt. No. 71, Part 66, ¶ 6 [Seger Aff.]; Dkt. No. 71, Part 67 [Ex. A to Seger Aff.].)

[92]     (Dkt. No. 71, Part 67 [Ex. A to Seger Aff.].)

[93]     (Dkt. No. 71, Part 66, ¶ 8 [Seger Aff.]; Dkt. No. 71, Part 24, ¶¶ 4, 5 [Connolly Aff.].)

[94]     (Dkt. No. 71, Part 32, ¶ 5 [Horan Aff.]; Dkt. No. 71, Part 24, ¶¶ 4, 5 [Connolly Aff.]; *see also* Dkt. No. 1, ¶ 67 [Complaint].)

[95]     (Dkt. No. 71, Part 32, ¶ 6 [Horan Aff.]; Dkt. No. 71, Part 33 [Ex. A to Horan Aff.].)

correspondence, MRC determined that the correspondence did not raise an issue for MRC, but rather raised a "package room issue" and a concern that the correspondence violated DOCS Directive 4422.[96]  MRC forwarded the documents to the Captain's Office for a determination whether Plaintiff should have access to the documents.[97]  Defendant Horan informed Plaintiff in writing that MRC had forwarded the documents to the Captain's Office for a determination of whether they violated DOCS Directive 4422 and 4572.[98]

41.    At some point between March 11, 2002, and March 14, 2002, Defendants Connolly and Gorelick received, reviewed, and discussed Plaintiff's correspondence from ACT.[99] Defendant Connolly believed that the photocopies contained in the correspondence were intended to be disseminated to other inmates in violation of Rule 105.12, providing that "[i]nmates shall not engage or encourage others to engage in unauthorized organizational activities or meetings . . . [or] distribute . . . unauthorized organizational . . . materials.  An unauthorized organization is any . . . organization which has not been approved by the Deputy Commissioner for Program Services."[100]  Defendants Connolly and Gorelick decided to return

---

[96]    (Dkt. No. 71, Part 32, ¶¶ 7-9 [Horan Aff.]; Dkt. No. 71, Part 34 [Ex. B to Horan Aff.].)

[97]    (Dkt. No. 71, Part 32, ¶ 9 [Horan Aff.]; Dkt. No. 71, Part 34 [Ex. B to Horan Aff.].)

[98]    (Dkt. No. 71, Part 32, ¶ 10 [Horan Aff.]; Dkt. No. 71, Part 34 [Ex. B to Horan Aff.].)

[99]    (Dkt. No. 71, Part 24, ¶¶ 4-7 [Connolly Aff.]; Dkt. No. 71, Part 31, ¶ 4-6 [Gorelick Aff.] *see also* Dkt. No. 1, ¶ 68 [Complaint].)

[100]    (Dkt. No. 71, Part 24, ¶ 6 [Connolly Aff.]; Dkt. No. 71, Part 31, ¶ 5 [Gorelick Aff.].)

the correspondence at issue to Defendant Horan so that the correspondence could be forwarded to the Central Office of Public Information in Albany ("Central Office") to determine whether the correspondence violated prison rules.[101]

42.    On March 14, 2002, Defendant Horan forwarded the correspondence at issue to the Central Office.[102]

43.    On March 20, 2002, the Central Office forwarded the correspondence at issue to the Deputy Commissioner for "whatever action he deems appropriate."[103]

44.    On March 20, 2002, Plaintiff filed a grievance (Grievance No. SHG-18829) regarding his March 8, 2002, incoming correspondence from ACT.[104]  Specifically, Plaintiff alleged that Defendants knowingly and wilfully obstructed his mail, and withheld his property, in violation of 18 U.S.C. § 1701 and the First, Fourth, and Fourteenth Amendments.[105]

45.    On March 21, 2002, Shawangunk C.F.'s Inmate Grievance Resolution Committee

---

[101]    (Dkt. No. 71, Part 24, ¶¶ 7-8 [Connolly Aff.]; Dkt. No. 71, Part 31, ¶ 6 [Gorelick Aff.]; Dkt. No. 71, Part 32, ¶ 11 [Horan Aff.]; *see also* Dkt. No. 1, ¶ 69 [Complaint].)

[102]    (Dkt. No. 71, Part 32, ¶ 12 [Horan Aff.]; Dkt. No. 71, Part 35 [Ex. C to Horan Aff.].)

[103]    (Dkt. No. 71, Part 32, ¶ 13 [Horan Aff.]; Dkt. No. 71, Part 36 [Ex. D to Horan Aff.].)

[104]    (Dkt. No. 71, Part 52, ¶ 15 [Portuondo Aff]; Dkt. No. 71, Part 55 at 1 [Ex. C to Portunondo Aff.]; *see also* Dkt. No. 1, ¶ 71 [Complaint].)

[105]    (Dkt. No. 71, Part 52, ¶ 15 [Portuondo Aff]; Dkt. No. 71, Part 55 at 2 [Ex. C to Portunondo Aff.]; *see also* Dkt. No. 1, ¶ 71 [Complaint].)

("IGRC") granted in part, and denied in part, Plaintiff's grievance.[106]  The IGRC granted

Plaintiff's grievance to the extent that Plaintiff sought to be provided with the names of the

members of the Facility Media Review Committee; however, the IGRC denied Plaintiff's

grievance to the extent that Plaintiff sought, among other things, to be immediately provided with

his correspondence from ACT.[107]  The stated reason for this denial was that the "documents are

in the process of being reviewed for content and are in [the] Central Office."[108]

      46.    On March 25, 2002, Plaintiff appealed the IGCR's decision to the

Superintendent.[109]

      47.    On March 27, 2002, Defendant Portuondo denied Plaintiff's appeal of the IGRC's

decision.[110]  The stated reason for the denial was that "[t]he documents [in question] have been

forwarded to [the] Central Office for review and appropriate action."[111]  Defendant Portuondo

has testified that what he meant by this statement was that "[i]n essence, [Plaintiff's] grievance

was premature because officials at [the] Central Office in Albany were reviewing the documents

---

    [106]    (*Compare* Dkt. No. 71, Part 55 [Ex. C to Portunondo Aff.] *with* Dkt. No. 71, Part 56 [Ex. D to Portunondo Aff.].)

    [107]    (Dkt. No. 71, Part 52, ¶ 16 [Portuondo Aff.]; *see also* Dkt. No. 1, ¶ 73 [Complaint].)

    [108]    (Dkt. No. 71, Part 52, ¶ 17 [Portuondo Aff.]; Dkt. No. 71, Part 56 [Ex. D to Portuondo Aff.].)

    [109]    (Dkt. No. 71, Part 56 [Ex. D to Portuondo Aff.].)

    [110]    (Dkt. No. 71, Part 52, ¶ 18 [Portuondo Aff.]; Dkt. No. 71, Part 57 [Ex. E to Portuondo Aff.]; *see also* Dkt. No. 1, ¶ 74 [Complaint].)

    [111]    (Dkt. No. 71, Part 52, ¶ 18 [Portuondo Aff.]; Dkt. No. 71, Part 57 [Ex. E to Portuondo Aff.].)

to determine whether they complied with all DOCS directives and rules."[112]

48.     At some point after March 27, 2002, Plaintiff received his ACT correspondence from the Central Office.[113]

**April 10, 2002, to April 29, 2002**
**Events at Shawangunk C.F.**
**(Disciplinary Hearing)**

49.     On or before April 10, 2002, Plaintiff was notified that he was charged with violating Rules 180.14 and 106.10 (failing to comply with an order to provide a urinalysis sample), that his disciplinary hearing would be held on April 16, 2002, and that Defendant Horan would be the hearing officer at that disciplinary hearing.[114]

50.     On April 11, 2002, Plaintiff sent a letter to Defendant Portuondo requesting to have Defendant Horan removed as the hearing officer presiding over the disciplinary hearing scheduled for April 16, 2002 due to the (alleged) fact that Defendant Horan had investigated the incident and thus was laboring under a conflict of interest.[115]

---

[112]     (Dkt. No. 71, Part 52, ¶ 19 [Portuondo Aff.].)

[113]     (*Compare* Dkt. No. 73, Part 2, ¶ 73 [Defs.' Rule 7.1 Statement, asserting this fact] *with* Dkt. No. 77 [Plf.'s Response, failing to deny this fact]; *see also* Dkt. No. 52 at 1 [Letter from Plaintiff to Court, dated 2/9/04, indicating that Plaintiff had been provided access to his correspondence from ACT at some point before October of 2003--apparently on or before May 21, 2003]; Dkt. No. 53 [Letter from Attorney Holohan to Court, dated 2/6/04, indicating that Plaintiff's correspondence from ACT had been returned to him in May of 2003]; Dkt. No. 60 at 1 [Letter from Plaintiff to Court, dated 3/30/04, indicating that Plaintiff had, by that point in time, reviewed his correspondence from ACT].)

[114]     (Dkt. No. 71, Part 58 [Ex. F to Portuondo Aff.].)

[115]     (Dkt. No. 71, Part 52, ¶ 22 [Portuondo Aff.]; Dkt. No. 71, Part 58 [Ex. F to Portuondo Aff.].)

51.     On April 16, 2002, Defendant Portuondo denied Plaintiff's request, informing Plaintiff, in part, that "I have carefully reviewed the circumstances surrounding this incident and found no evidence to substantiate your allegations [of a conflict of interest]."[116]

52.     On April 16, 2002, Plaintiff's disciplinary hearing was held.[117]  Defendant Horan presided over that hearing as the hearing officer.[118]  Defendant Horan found Plaintiff guilty of violating Rule 180.14.[119]

53.     On April 16, 2002, Plaintiff petitioned Defendant Portuondo for discretionary review of Defendant Horan's disciplinary hearing determination.[120]

54.     After receiving and reviewing that petition on or about April 17, 2002, Defendant Portuondo decided to deny Plaintiff's petition on the ground that there was no evidence to support his allegations, and Defendant Portuondo so noted that decision in handwriting on the top margin of Plaintiff's petition.[121]

---

[116]     (Dkt. No. 71, Part 52, ¶ 23 [Portuondo Aff.]; Dkt. No. 71, Part 59 [Ex. G to Portuondo Aff.].)

[117]     (Dkt. No. 71, Part 52, ¶¶ 21, 24 [Portuondo Aff.]; Dkt. No. 71, Part 60 [Ex. H to Portuondo Aff.]; *see also* Dkt. No. 1, ¶ 75 [Complaint].)

[118]     (Dkt. No. 71, Part 52, ¶¶ 21, 24 [Portuondo Aff.]; Dkt. No. 71, Part 60 [Ex. H to Portuondo Aff.]; *see also* Dkt. No. 1, ¶ 75 [Complaint].)

[119]     (Dkt. No. 71, Part 60 [Ex. H to Portuondo Aff.]; *see also* Dkt. No. 1, ¶ 75 [Complaint].)

[120]     (Dkt. No. 71, Part 52, ¶ 24 [Portuondo Aff.]; Dkt. No. 71, Part 60 [Ex. H to Portuondo Aff.]; Dkt. No. 71, Part 20 [Ex. B to Briggs Aff.]; *see also* Dkt. No. 1, ¶ 75 [Complaint].)

[121]     (Dkt. No. 71, Part 52, ¶ 25 [Portuondo Aff.]; Dkt. No. 71, Part 60 [Ex. H to Portuondo Aff.]; Dkt. No. 71, Part 18, ¶¶ 7, 10 [Briggs Aff.].)

55.     On April 26, 2002, at the request of Defendant Portuondo, Defendant Briggs

prepared a memorandum to Plaintiff regarding his petition.[122]  That memorandum, which was

from Defendant Portuondo, stated, in part, that "I have carefully reviewed the written portion of

your hearing and found no evidence to substantiate your allegations.  Therefore, I affirm the

decision of the hearing officer."[123]

56.     On April 29, 2002, Defendant Portuondo was absent from Shawangunk C.F.[124]

That same day, Defendant Maly, who was serving as Acting Superintendent for the day, endorsed

the memorandum prepared by Defendant Briggs at the request of Defendant Portuondo.[125]

**May 2, 2002, to May 8, 2002**
**Events at Shawangunk C.F.**
**(Grievance)**

57.     On May 2, 2002, Plaintiff filed a grievance (Grievance No. SHG-18952)

regarding the review of his April 16, 2002, disciplinary hearing.[126]  In his grievance, Plaintiff

alleged, in part, that Defendants Briggs and Maly had "intentionally prevented [Defendant]

---

[122]     (Dkt. No. 71, Part 52, ¶ 26 [Portuondo Aff.]; Dkt. No. 71, Part 61 [Ex. I to
Portuondo Aff.]; Dkt. No. 71, Part 18, ¶ 8 [Briggs Aff.].)

[123]     (Dkt. No. 71, Part 52, ¶ 26 [Portuondo Aff.]; Dkt. No. 71, Part 61 [Ex. I to
Portuondo Aff.]; Dkt. No. 71, Part 18, ¶ 8 [Briggs Aff.].)

[124]     (Dkt. No. 71, Part 52, ¶¶ 6, 27 [Portuondo Aff.]; Dkt. No. 71, Part 53 [Ex. A to
Portuondo Aff.].)

[125]     (Dkt. No. 71, Part 52, ¶ 28 [Portuondo Aff.]; Dkt. No. 71, Part 61 [Ex. I to
Portuondo Aff.]; Dkt. No. 71, Part 18, ¶ 9 [Briggs Aff.]; Dkt. No. 71, Part 50, ¶¶ 7-9 [Maly
Aff.]); Dkt. No. 71, Part 51 [Ex. A to Maly Aff.].)

[126]     (Dkt. No 71, Part 52, ¶ 98 [Portuondo Aff.]; Dkt. No. 71, Part 7, ¶ 7 [Bisceglia
Aff.]; Dkt. No. 71, Part 8 [Ex. A to Bisceglia Aff.]; *see also* Dkt. No. 1, ¶ 80 [Complaint].)

Portuondo from performing an official function, by means of interference."[127]  In essence, Plaintiff alleged that Defendant Briggs (not Defendant Portuondo) reviewed and affirmed the decision of the hearing officer, and that Defendant Maly endorsed Defendant Briggs' memorandum decision–all in an effort to deprive Plaintiff of the right to have the matter reviewed by Defendant Portuondo.[128]

58.     On May 3, 2002, Defendant Maly issued an investigative report stating, in part, that Plaintiff "has no idea, nor would he have any way of knowing what transpired in regard to his request for a discretionary review of the Tier III hearing he has referenced.  He is dealing strictly in supposition, and he is wrong."[129]

59.     On May 6, 2002, the Shawangunk C.F. IGRC denied Plaintiff's grievance.[130]

60.     On May 8, 2002, Defendant Portuondo was absent from Shawangunk C.F.[131]  As a result, Defendant Bisceglia was assigned as Acting Superintendent.[132]  After reviewing the entire grievance package, Defendant Bisceglia issued a decision affirming the denial of Plaintiff's May

---

[127]     (Dkt. No. 71, Part 8 [Ex. A to Bisceglia Aff.]; *see also* Dkt. No. 1, ¶ 80 [Complaint].)

[128]     (Dkt. No. 71, Part 8 [Ex. A to Bisceglia Aff.]; *see also* Dkt. No. 1, ¶ 80 [Complaint].)

[129]     (Dkt. No. 71, Part 9 [Ex. B to Bisceglia Aff.]; *see also* Dkt. No. 1, ¶ 82 [Complaint].)

[130]     (Dkt. No. 71, Part 10 [Ex. C to Bisceglia Aff.].)

[131]     (Dkt. No. 71, Part 52, ¶ 8 [Portuondo Aff.]; Dkt. No. 71, Part 53 [Ex. A to Portuondo Aff.].)

[132]     (Dkt. No. 71, Part 52, ¶ 9 [Portuondo Aff.]; Dkt. No. 71, Part 7, ¶ 6 [Bisceglia Aff.].)

2, 2002, grievance.[133]  Specifically, Defendant Bisceglia stated, in part, that "[t]he grievant has no

idea, nor would he have any way of knowing what transpired in regard to his request for a

discretionary review of the Tier III hearing he has referred to.  The grievant is dealing strictly in

supposition."[134]  Defendant Bisceglia has testified that, "[w]hile this decision was in line with

[Defendant] Maly's investigation report . . . I made an independent assessment of the grievance

packet."[135]

## IV.    ANALYSIS

### A.    Plaintiff's Claims Arising from His Upstate C.F. Disciplinary Hearing and S.H.U. Confinement

With regard to Plaintiff's claims that his constitutional rights were violated in connection

with his Upstate C.F. disciplinary hearing and S.H.U. confinement, Defendants argue that (1)

Plaintiff fails to establish the personal involvement of Defendant Ricks, (2) Plaintiff has not

demonstrated a protected liberty interest with regard to his S.H.U. confinement, (3) Plaintiff was

afforded all process that he was due under *Wolff v. McDonnell,* 418 U.S. 539 (1974), and (4) in

any event, Defendants Ricks and Boucaud are entitled to qualified immunity.  (Dkt. No. 71, Part

68 at 4-14 [Defs.' Mem. of Law].)

---

[133]     (Dkt. No. 71, Part 7, ¶¶ 8-10 [Bisceglia Aff.]; *see also* Dkt. No. 1, ¶ 83 [Complaint].)

[134]     (Dkt. No. 71, Part 11 [Ex. D to Bisceglia Aff.].)

[135]     (Dkt. No. 71, Part 7, ¶ 10 [Bisceglia Aff.]; *compare* Dkt. No. 73, Part 2, ¶ 100 [Defs.' Amended Rule 7.1 Statement, asserting this fact] *with* Dkt. No. 77 [Plf.'s Opposition, not denying this fact].)

### 1.    Whether Plaintiff Has Established the Personal Involvement of Defendant Ricks

A defendant's personal involvement in the alleged unlawful conduct is a prerequisite for a finding of liability in a Section 1983 action. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977).  If the defendant is a supervisory official, such as a prison superintendent, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985). Rather, in order for a supervisory official to be personally involved in unlawful conduct, he or she must have (1) directly participated in that violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).

Here, I find that Defendant Ricks was not personally involved in the alleged constitutional violations for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68 at 4-8 [Defs.' Mem. of Law]), which reasons are not specifically disputed by Plaintiff in his opposition papers (Dkt. No. 77 [Plf.'s Response]).[136]  For example, Defendant

---

[136]    N.D.N.Y. L. R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule

Ricks' March 3, 2000, denial of Plaintiff's January 10, 2000, grievance is not sufficient, *under the circumstances*, to establish such personal involvement.[137]  Specifically, not only did Plaintiff's grievance (and appeal) fail to notify Defendant Ricks of a constitutional violation,[138] but Defendant Ricks responded properly to Plaintiff's grievance, instructing Plaintiff to present any complaints about the disciplinary hearing in his appeal of his disciplinary hearing

---

requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."); *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendant in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendant with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]).

[137]     I recognize the conflict in this Circuit between district courts regarding whether a superintendent's denial of a grievance is sufficient to establish that superintendent's personal involvement in an alleged constitutional violation.  *Compare McKenna v. Wright*, 01-CV-6571, 2004 WL 102752, at *6 (S.D.N.Y. Jan. 21, 2004) (discussing conflict, and concluding that such denial does establish personal involvement) *with Villante v. N.Y. State Dep't of Corr. Servs.*, 96-CV-1484, 2001 U.S. Dist. LEXIS 25208, at 16-17 (N.D.N.Y. Oct. 25, 2001) (Homer, M.J.) (concluding that "[t]he fact that [Superintendent] Mann denied the [two] grievances does not establish any personal involvement by defendant Mann in the alleged denial of adequate medical care"), Report and Recommendation *adopted by* 2002 U.S. Dist. LEXIS 26279 (N.D.N.Y. March 28, 2002) (Mordue, J.), *affirmed by* 2003 U.S. App. LEXIS 2709 (Feb. 13, 2003) (unpublished decision cited herein only to show subsequent history of district court decision).  However, I need not resolve this conflict in order to conclude that Defendant Ricks was not personally involved in an alleged constitutional violation, because I find that (1) Plaintiff's grievance did not notify Defendant Ricks of a constitutional violation and (2) in any event, Defendant Ricks did not fail, in any way, in responding to Plaintiff's grievance.

[138]     (*See* Dkt. No. 71, Part 65 [Ex. C to Ricks Aff., attaching Plaintiff's grievance, which failed to notify Defendant Ricks of any issue regarding the hearing officer's reliance on a confidential informant, but notified Defendant Ricks only of two issues that did not constitute, or regard, actual violations of law].)

determination,[139] which Plaintiff did.[140]  Furthermore, no evidence (or even non-conclusory

allegations) exist that Defendant Ricks created (or allowed to continue) a policy or custom under

which the alleged violations occurred, or that he was grossly negligent in managing subordinates

who caused those alleged violations.

As a result, I recommend that the Court dismiss Plaintiff's claims against Defendant

Ricks on the basis of lack of personal involvement.

### 2.    Whether Plaintiff Has Demonstrated a Protected Liberty Interest with Regard to His S.H.U. Confinement

A prisoner's liberty interest is implicated by prison discipline, such as S.H.U.

confinement, only if the discipline imposes an "atypical and significant hardship on the inmate in

relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995);

*Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d

Cir. 1996) (per curium).  The Second Circuit has interpreted *Sandin* to require that courts

examine the specific circumstances of the punishment.  *Sims v. Artuz*, 230 F.2d 14, 22 (2d Cir.

2000); *Scott v. Albany*, 156 F.3d 283, 287 (2d Cir. 1998) (per curium).  Factors relevant to

determining whether Plaintiff endured an "atypical and significant hardship" include "the extent

to which the conditions of the disciplinary segregation differ from other routine prison

conditions" and "the duration of the disciplinary segregation imposed compared to discretionary

confinement."  *Sims*, 230 F.2d at 22; *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998).

---

[139]      (*See*, *supra*, Statement of Fact No. 13.)

[140]      (*See*, *supra*, Statement of Fact No. 14.)

In other words, duration is not the only relevant factor.  The conditions of confinement are a distinct and equally important consideration in determining whether a confinement in S.H.U. rises to the level of "atypical and severe hardship . . . ."  *Ortiz v. McBride*, 323 F.3d 191, 195 (2d Cir. 2003) (per curium).  "[H]arsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical."  *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).  Accordingly, the Second Circuit has explicitly avoided a bright-line rule that a certain period of confinement in S.H.U. automatically fails to implicate due process rights.  *See Sims*, 230 F.3d at 23; *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000).  Rather, the Second Circuit has established guidelines for use by the district courts in determining whether a prisoner's liberty interest was infringed.

Under these guidelines, the Second Circuit has explicitly noted that S.H.U. confinements of fewer than 101 days could constitute "atypical and significant hardship" if the conditions were more severe than "normal" S.H.U. conditions (discussed in *Sealey*), or if a more fully developed record showed that even relatively brief confinements under normal S.H.U. conditions were, in fact, atypical.  *See Ortiz*, 323 F.3d at 195 & n. 1; *Sims*, 230 F.3d at 23; *Colon*, 215 F.3d at 232 n. 5; *Sealey*, 197 F.3d at 586; *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999).

Under "normal conditions of S.H.U. confinement in New York," the prisoner is

> placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners such as the opportunity to work and obtain out-of-cell schooling.  Visitors [are] permitted, but the frequency and duration [is] less than in general population.  The number of books allowed in the cell [is] also limited.

N.Y. Comp. Codes R. & Regs. tit. 7, §§ 304.1-.14, 305.1-.6 (listing the "services" and "controls" of special housing units); *Colon*, 215 F.3d at 230 (citations omitted); *Palmer*, 364 F.3d at 66 n. 3; *see also, Sealey*, 197 F.3d at 581 ("An inmate confined to his cell 23 hours per day, can take no more than three showers per week, has limited library privileges and no telephone privileges."); *Frazier*, 81 F.3d at 315 (providing a similar description).

Here, I find that Plaintiff has not demonstrated a protected liberty interest with regard to his S.H.U. confinement for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68 at 8-11 [Defs.' Mem. of Law]), which reasons are not specifically disputed by Plaintiff in his opposition papers (Dkt. No. 77 [Plf.'s Response]).[141]  For example, Plaintiff served 67 days of S.H.U. confinement at Upstate C.F. as a result of being charged with, and found guilty of, helping to plan the Y2K work stoppage (a confinement unrelated to his previous S.H.U. confinement at Green Haven C.F., resulting from his refusal to comply with DOCS' tuberculosis testing and inoculation requirements).[142]  This time period is well short of the 101-day time period held by the Second Circuit to *generally* (absent a showing that the confinement has been atypical) trigger Due Process protection.[143]  Furthermore, the conditions of confinement at Green Haven C.F. that Plaintiff alleges, even if assumed to be true, were *typical* of the

---

[141]     N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

[142]     (*See* Findings of Fact Nos. 3, 6, 16.)

[143]     *See Colon*, 215 F.3d at 229, 232, 237 (citation omitted); *see also Nwaokocha v. Sadowski*, 369 F. Supp.2d 362, 370 (E.D.N.Y. 2005) (collecting Second Circuit cases); *Durran v. Selsky*, 251 F. Supp.2d 1208, 1214 (W.D.N.Y. 2003); *Alvarado v. Kerrigan*, 152 F. Supp.2d 350, 354-355 (S.D.N.Y. 2001).

conditions of normal S.H.U. confinement (described above).[144]

   As a result, I recommend that the Court dismiss Plaintiff's claims against Defendants

Ricks and Boucaud regarding his S.H.U. confinement at Upstate C.F.

### 3. Whether Plaintiff Was Afforded All the Process He Was Due Under *Wolff v. McDonnell*

   While inmates are afforded due process protections at disciplinary hearings, they are not

entitled to the "full panoply of rights" due to criminal defendants. *Wolff v. McDonnell*, 418 U.S.

539, 559 (1974); *Taylor v. Rodriguez*, 238 F.3d 188, 192 (2d Cir. 2001). The due process rights

afforded inmates in a prison disciplinary context include the following: (1) the right to 24-hour

advance written notice of the charges; (2) the right to a fair and impartial hearing officer; (3) the

right to a hearing affording the inmate a reasonable opportunity to call witnesses and present

documentary evidence;[145] and (4) the right to a written statement of the disposition, including the

evidence relied upon and the reasons for the disciplinary action taken.[146]  *Superintendent v. Hill*,

472 U.S. 445, 455 (1985); *Wolff*, 418 U.S. at 563-564, 566; *Sira v. Morton*, 380 F.3d 57, 69 (2d

Cir. 2004); *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999).

---

[144]     (Dkt. No. 1, ¶ 36 [Complaint].)

[145]     With regard to the use of witnesses, it is well-settled that since "[c]onfrontation and cross-examination present greater hazards to institutional interests . . . including a high risk of reprisal within the institution," prison officials have broad discretion to restrict an inmate's right to confront and cross-examine his or her accusers.  *Wolff*, 418 U.S. at 567-69.

[146]     Judicial review of the written findings required for prison disciplinary hearing is limited to determining whether the disposition is supported by "some evidence."  *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004).  This standard is extremely tolerant and is satisfied if there is *any* reliable evidence in the record that supports the disciplinary ruling.  *Sira*, 380 F.3d at 69; *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000).

Here, I find that Plaintiff was afforded all the process that he was due under *Wolff v.*

*McDonnell*, for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part

68 at 11-14 [Defs.' Mem. of Law]), which reasons are not specifically disputed by Plaintiff in his

opposition papers (Dkt. No. 77 [Plf.'s Response]).[147]   I would only add two points.

First, after Defendants filed their memorandum in support of their motion on July 8,

2004, the Second Circuit issued a decision that made Defendants' assertion that "the Second

Circuit has yet to definitively determine whether an inmate has the right to an **independent**

assessment of the credibility of confidential informants" no longer accurate.  (Dkt. No. 71, Part

68 at 13 [Defs.' Mem. of Law, dated Feb. 2004].)  Specifically, on August 17, 2004, the Second

Circuit answered the issue as framed by Defendants in the affirmative.[148]   However, the

undisputed facts of this case indicate that Defendant Boucaud complied with even this more

stringent standard.  Defendant Boucaud independently assessed the credibility of the informant

---

[147]     N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS
12285, at *27-31.

[148]     As the Second Circuit recently observed in a case factually similar to this one:

> At the time of Sira's disciplinary proceedings [which
> concluded on February 8, 2000], the law of this circuit recognized a
> due process obligation to conduct some assessment of informant
> credibility to support prison discipline . . . but there was an
> ambiguity–which persisted at least until this court's decision in *Taylor
> v. Rodriguez*, 238 F.3d [188], 192-93 [2d Cir. Jan. 18, 2001], and
> possibly thereafter, *see Gaston v. Coughlin*, 249 F.3d [156], 163 [2d
> Cir. May 7, 2001]–as to whether a hearing officer was required to
> conduct an independent assessment or whether he could rely on the
> opinion of another person. . . .  [T]his principle was not clearly
> established before today [August 17, 2004] . . . .

*Sira v. Morton*, 380 F.3d 57, 82 (2d Cir. Aug. 17, 2004) (citations omitted).

43

by asking C.O. Williams questions about the informant's reliability, and by learning (among

other things) how long C.O. Williams had used the informant, the fact that the informant was 90

percent accurate, and the fact that the informant asked nothing in return.[149]  Conducting such an

independent assessment does not require direct examination of the informant.[150]

Second, in their memorandum of law, Defendants raise the specter of a possible claim by

Plaintiff against Defendant Boucaud for relying, in establishing Plaintiff's guilt, on evidence that

was not specific as to the date, time and place that Plaintiff violated prison rules.[151]  I would like

to clarify that I do not, even under the most liberal of constructions, read Plaintiff's Complaint as

asserting a claim against Defendant Boucaud for violating Plaintiff's Due Process rights by

holding a disciplinary hearing based on a misbehavior report that was not sufficiently specific to

notify Plaintiff of the charge against him.[152]  Even if Plaintiff's Complaint contained such a

---

[149]    *See*, *supra*, Statement of Fact No. 9 (citing Dkt. No. 71, Part 4 [Ex. A to Holohan Aff.].).  *See Sira*, 380 F.3d at 78 ("The record of this case demonstrates . . . that Capt. Morgan independently assessed the credibility of these informants by inquiring as to their record of reliability."); *Gaston v. Coughlin*, 249 F.3d 156, 163 (2d Cir. 2001) (finding that it was not necessary to decide whether an *independent* assessment was required because record clearly demonstrated that hearing officer had conducted a satisfactory independent assessment of informant reliability in light of "the informant's credible explanation as to why he had come forward, his statement that he sought no favor in return, and his past proven reliability"); *Russell v. Scully*, 15 F.3d 219, 223 (2d Cir. 1994) (finding that it was not necessary to decide whether an *independent* assessment was required because such an independent assessment had occurred in that the hearing officer had asked the correction officer a question akin to "Has the informant a history of reliability" and learned the number of years the correction officer had dealt with each informant and that each informant had been extremely reliable).

[150]    *See Sira*, 380 F.3d at 77, note 10 (citing *Russell v. Scully*, 15 F.3d 219, 223 [2d Cir. 1994]).

[151]    (Dkt. No. 71, Part 68 at 12 [Defs.' Mem. of Law] [citing to Complaint, ¶ 27].)

[152]    (*See*, *e.g.*, Dkt. No. 1, ¶ 27 [Complaint] [regarding the testimony of C.O. Williams at the disciplinary hearing, not the specifics of the misbehavior report].)

claim, I think that claim would fail as a matter of fact, under the circumstances. The misbehavior report may well meet the standard set by the Second Circuit in *Sira*, a case that–although somewhat factually analogous to the case at hand–was based, in part, on the fact that the plaintiff, once he was expressly appraised of the specifics of the charge against him at his disciplinary hearing, was not afforded the opportunity to prepare a response to the new information.[153]  Here, even if Plaintiff was not advised of the specifics of the charge against him until his disciplinary hearing commenced on December 30, 1999, he was able to prepare a response to those specifics during the seven-day time period over which the hearing was adjourned (i.e., before it was concluded on January 6, 2000).[154]

As a result, I recommend that the Court dismiss any claims by Plaintiff against Defendants Ricks and Boucaud regarding Plaintiff's disciplinary hearing at Upstate C.F.

### 4.   Whether Defendants Ricks and Boucaud Are Entitled to Qualified Immunity

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 [1982]); *see also*

---

[153]      *Sira,* 380 F.3d at 71-72.

[154]      As stated above in Statement of Fact No. 7, on December 30, 1999, C.O. Williams testified that Plaintiff was identified as having violated Rule 104.12 at various times since the start of the labor-strike investigation in April of 1999, in part through his conspiring with other inmates and propagating certain materials that Plaintiff had written while located in the facility's "physical plant" (prior to the start of his medical confinement on or about February 10, 1999).  (Dkt. No. 71, Part 12 at 18-20 [Ex. A to Boucaud Aff.].)

45

*Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).  Regarding the issue of whether a particular right was *clearly established*, courts in this Circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted), *cert. denied*, 503 U.S. 962 (1992).[155]  Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness"[156] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin*, 901 F. Supp. 757, 764 (S.D.N.Y. 1995) (citing cases).  As the Supreme Court explained,

> [T]he qualified immunity defense . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law.
>
> . . . Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

---

[155]     *See also Calhoun v. New York State Division of Parole*, 999 F.2d 647, 654 (2d Cir. 1993); *Prue v. City of Syracuse*, 26 F.3d 14, 17-18 (2d Cir. 1994); *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998).

[156]     *See Anderson v. Creighton*, 107 S.Ct. 3034, 3038 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.'") (quoting *Harlow*, 457 U.S. at 819); *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

*Malley*, 475 U.S. At 341.  Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."  *Malsh*, 901 F. Supp. at 764 (citing *Cartier v. Lussier*, 955 F.2d 841, 844 [2d Cir. 1992] [citing Supreme Court cases]).

Here, I find that Defendants Ricks and Boucaud are entitled to qualified immunity for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68 at 14-15 [Defs.' Mem. of Law]), which reasons are not specifically disputed by Plaintiff in his opposition papers (Dkt. No. 77 [Plf.'s Response]).[157]  I would only add one point.  Although Defendant Boucaud *independently* assessed the reliability of C.O. Williams' confidential informant on January 6, 2000 (as described above), he need not have made such an *independent* assessment in order to be entitled to qualified immunity.  That is because the principle that a hearing officer had to conduct such an *independent* assessment (as opposed to simply relying on the opinion of another person) was not *clearly established* until August 17, 2004, when the Second Circuit decided *Sira v. Morton*, 380 F.3d 57, 82 (2d Cir. 2004).

As a result, I recommend that the Court dismiss Plaintiff's claims against Defendants Ricks and Boucaud on the basis of qualified immunity.

## B.    Plaintiff's Claims Arising from the Collection of His Blood Sample for DNA Testing and Inclusion in the New York State DNA Database

With regard to Plaintiff's claims that his constitutional rights were violated in connection with the collection of his blood sample for DNA testing and the inclusion of that sample in the

---

[157]    N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

New York State DNA database, Defendant's argue that (1) Plaintiff is barred from bringing this claim based on the doctrine of collateral estoppel (also known as "issue preclusion"), (2) Plaintiff fails to establish that the collection of his blood sample violated his constitutional rights, and (3) in any event, Defendant Chapman is entitled to qualified immunity.  (Dkt. No. 71, Part 68 at 15-18 [Defs.' Mem. of Law].)  Liberally construed, Plaintiff's response papers address only the first argument, contending that the previous action to which Defendants refer--an Article 78 proceeding in Supreme Court, Albany County filed on or about October 24, 2001--did not result in a final decision on that merits that has the effect of collateral estoppel.  (Dkt. No. 77 at 3-4 [Plf.'s Response].)

### 1.      Whether Plaintiff is Barred from Bringing this Claim Based on the Doctrine of Collateral Estoppel (or "Issue Preclusion")

The doctrine of collateral estoppel prevents the re-litigation of claims and issues that were clearly raised and decided in a prior proceeding.  *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa*, 56 F.3d 359, 368 (2d Cir. 1995).  New York law[158] requires four conditions to be met for the collateral estoppel doctrine to apply: (1) the issues in both proceedings must be identical; (2) the issue in the prior proceeding must have been litigated and decided; (3) there must have been a full and fair opportunity to litigate the issue in the prior proceeding; and (4) the issue in the prior proceeding must be necessary to support a valid and final judgment on the merits.  *Grieve v. Tamerin*, 269 F.3d 149, 153 (2d Cir. 2001).

---

[158]      The preclusive effect of a New York State court judgment in a subsequent federal action is determined in accordance with New York law.  *See* 28 U.S.C. § 1738 ("[The] judicial proceedings [of any court of any State] . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken.").

Here, I find that Plaintiff is barred from bringing this claim based on the doctrine of collateral estoppel for the reasons stated by Defendants in their memorandum of law.  (Dkt. No. 71, Part 68 at 15-16 [Defs.' Mem. of Law].)  I reject Plaintiff's arguments in his response papers. (Dkt. No. 77 at 3-4 [Plf.'s Response].)

Specifically, I reject any argument by Plaintiff that he was denied a full and fair opportunity to litigate the issue (regarding the constitutionality of the collection of his blood sample for testing and inclusion in the DNA database) in the prior New York Supreme Court Article 78 proceeding (Index No. 5502-01).[159]  "[T]he part[y] opposing the application of collateral estoppel . . . bear[s] the burden of proving that [he] [was] denied [the] full and fair opportunity [to litigate the issue in the prior proceeding]."  *Hickerson v. City of New York*, 146 F.3d 99, 100 (2d Cir. 1998) (citations omitted).  Plaintiff has not met that burden.  His suggestion that he did not know his Article 78 proceeding was pending and thus he could not fully litigate the issues contained therein (because he never received a date-stamped copy of the petition from the state court clerk's office) is disingenuous and, frankly, incredible.[160]  His response papers are conspicuously devoid of any denial that he submitted the petition to the clerk's office for filing.[161]  Indeed, in his memorandum of law in support of the Article 78 petition (which memorandum is dated October 24, 2001), Plaintiff (1) records the index number assigned to the case by the clerk's office upon filing (5502-01), and (2) admits that "[t]he petition and supporting papers were received by the office of Albany County Combined Courts on September 14, 2001.

---

[159]     (Dkt. No. 77 at 3 [Plf.'s Response].)

[160]     (Dkt. No. 77 at 3 [Plf.'s Response].)

[161]     (Dkt. No. 77 at 3 [Plf.'s Response].)

49

An Order to Show Cause dated September 21, 2001 was issued by the Court [with regard to the petition].”[162]  In short, the fact that the petition was filed (and litigated) is undisputed.[163]

Similarly, I reject any argument by Plaintiff that the New York State Supreme Court's January 12, 2002, written “Decision & Judgment” dismissing Plaintiff's Article 78 petition is either (1) unauthentic or (2) without preclusive effect (allegedly because it does not direct that a judgment be entered and because it is not signed and entered by the court clerk).[164]  It is an undisputed fact that, after discussing the merits of Plaintiff's claims, the Decision & Judgment (1) held that “[f]or the reasons stated above, the claims in the petition fail,” (2) ordered and adjudged that “the petition is dismissed,” and (3) expressly stated that “[t]his constitutes the Decision & Judgment of this Court.”[165]  Furthermore, it is an undisputed fact that the Decision & Judgment was filed with the Albany County Clerk's Office on February 6, 2002.[166]  Even if the Decision & Judgment had not been filed by the clerk's office, I believe that (as a final order of the court) it would carry collateral estoppel effect under New York law.[167]

---

[162]     (Dkt. No. 71, Part 5 [Ex. B to Holohan Aff.].)

[163]     (*See*, *supra*, Statement of Fact Nos. 30-31.)

[164]     (Dkt. No. 77 at 4 [Plf.'s Response].)

[165]     (*See*, *supra*, Statement of Fact No. 31.)

[166]     (*See*, *supra*, Statement of Fact No. 31.)

[167]     *See Slater v. American Min. Spirits Co.*, 33 N.Y.2d 443, 446-47, 354 N.Y.S.2d 620, 622-23 (N.Y. 1973) (attaching preclusive effect to a final order, even though “the record [did] not disclose the formal entry of a final judgment”); *Litz Enterprises v. Standard Steel Indus., Inc.*, 57 A.D.2d 34, 38, 394 N.Y.S.2d 765, 768 (4th Dept. 1977) (“Nor will a party be denied the benefits of *res judicata* where a final order on the merits has not been reduced to a formal judgment, if it is on the merits and the time to appeal has expired.”); 73A N.Y. Jur. *Judgments* § 381 (2d ed. 2003) (“[A] judgment does not lose its effectiveness as res judicata

As a result, I recommend that the Court dismiss all of Plaintiff's claims regarding his

DNA sample on the basis of collateral estoppel.

>    **2.     Whether Plaintiff Has Established that the Collection of His Blood Sample Violated His Constitutional Rights**

The Second Circuit has considered and upheld statutes requiring certain convicts to

submit blood samples for analysis and inclusion in a DNA database.[168]  Indeed, several district

courts in the Second Circuit, including this Court, have upheld New York's DNA index statute,

N.Y. Exec. Law § 995, over almost every conceivable constitutional challenge.  *See Nicolas v.

Goord*, 01-CV-7891, 2004 WL 1432533, at *3-5 (S.D.N.Y. June 24, 2004); *Zaire v. Barringer*,

01-CV-1865, 2003 WL 57918, at *3 (N.D.N.Y. Jan. 7, 2003) (Sharpe, M.J.); *Yusov v. Martinez*,

00-CV-5577, 2000 WL 1593387, *4-5 (S.D.N.Y. Oct. 24, 2000).

Here, I find that Plaintiff has not established that the collection of his blood sample

violated his constitutional rights, for the reasons stated by Defendants in their memorandum of

law (Dkt. No. 71, Part 68 at 14-15 [Defs.' Mem. of Law]), which reasons are not specifically

---

from the mere fact that it is irregular . . . .") (citing cases); 73A N.Y. Jur. *Judgments* § 66 (2d ed. 2003) ("A judgment or order shall not be . . . impaired, or affected by any mistake, effect, or irregularity in the papers or procedures in the action not affecting a substantial right of the party . . . ."); N.Y. C.P.L.R. 2220 (treating an order that has not been filed in the clerk's office as merely "irregular"); *cf. Mosher v. City of Albany*, 129 A.D.2d 932, 933, 514 N.Y.S.2d 822, 823 (3d Dept. 1987) (granting preclusive effect to an Article 78 proceeding that did not even result in a final order).  I note that the N.Y. C.P.L.R. sections that Plaintiff cites (§§ 5011, 411, 5016[a], 5016[c], and 7806) either are inapposite or actually undermine his argument.

[168]    *See Roe v. Marcotte,* 193 F.3d 72, 78-80 (2d Cir. 1999) (upholding Connecticut DNA index statute, which is substantially similar to N.Y. Exec. Law § 995); *U.S. v. Lifshitz*, 369 F.3d 173, 186-87 (2d Cir. 2004) ("Several circuits, including our own, have considered and upheld statutes requiring convicted sex offenders to submit a blood sample for analysis and inclusion in the DNA data banks.") (citations omitted).

disputed by Plaintiff in his opposition papers (Dkt. No. 77 [Plf.'s Response]).[169]  I would add

only one point.  One of the flaws inherent in Plaintiff's claim is the incorrect assumption that he

is not a "designated offender" under N.Y. Exec. Law §§ 995(7), 995-c(2) merely because the

correctional facility at which he is currently incarcerated does not have on file a "certificate of

conviction" (as that term is construed under N.Y. Crim. Proc. Law § 380.60) but a "Sentence &

Commitment" form.

As a result, I recommend that the Court dismiss all of Plaintiff's claims regarding his

DNA sample.

### 3.    Whether Defendants Chapman and Duncan Are Entitled to Qualified Immunity

As discussed above in Part IV.A.4., "Once qualified immunity is pleaded, plaintiff's

complaint will be dismissed unless defendant's alleged conduct, when committed, violated

*clearly established* statutory or constitutional rights of which a reasonable person would have

known.'"  *Williams*, 781 F.2d at 322 [emphasis added].

Here, I find that Defendant Chapman is entitled to qualified immunity for the reasons

stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68 at 18 [Defs.' Mem. of

Law]), which reasons are not specifically disputed by Plaintiff in his opposition papers (Dkt. No.

77 [Plf.'s Response]).[170]  In addition, I find that Defendant Duncan is entitled to qualified

---

[169]    N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

[170]    N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

immunity for the same reasons, although Defendants do not advance that argument.  Specifically,

I find that the constitutional right that Plaintiff claims (i.e., the right to have his "certificate of

conviction" on file at a correctional facility prior to the facility's collecting his blood sample for

inclusion in a DNA database) was not *clearly established* at the time of the incident (in July of

2001).  Indeed, I can find no decision by either the Supreme Court or Second Circuit, from even

after July of 2001, clearly establishing that constitutional right.

As a result, I recommend that the Court dismiss Plaintiff's DNA claims against

Defendants Chapman and Duncan on the basis of qualified immunity.

## C.   Plaintiff's Claims Arising from the Collection of His Urine Sample for Drug Testing Following a Family Day Event

With regard to Plaintiff's claims that his constitutional rights were violated in connection

with the collection of his urine sample for drug testing following the Rastafarian Family Day

Event, Defendants argue that (1) Plaintiff has not established the personal involvement of

Defendant Duncan, (2) Plaintiff has not established that his urine sample was taken on the basis

of his race or religion, (3) Plaintiff was ordered to provide a urine sample on the basis of

suspected drug or alcohol use, and (4) in any event, Defendant Duncan is entitled to qualified

immunity.  (Dkt. No. 71, Part 68 at 18-22 [Defs.' Mem. of Law].)

### 1.   Whether Plaintiff Has Established the Personal Involvement of Defendant Duncan

As discussed above in Part IV.A.1., in the Second Circuit, a defendant's personal

involvement in the alleged unlawful conduct is a prerequisite for a finding of liability in a

Section 1983 action.  *See Wright*, 21 F.3d at 501; *McKinnon*, 568 F.2d at 934.

Here, I find that Plaintiff has not established the personal involvement of Defendant

Duncan, for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68

at 19 [Defs.' Mem. of Law]), which reasons are not specifically disputed by Plaintiff in his

opposition papers (Dkt. No. 77 [Plf.'s Response]).[171]  I would add only two points.  First,

Defendant Duncan's December 12, 2000, denial of Plaintiff's November 11, 2000, grievance is

not sufficient, under the circumstances, to establish Defendant Duncan's personal involvement in

a constitutional violation.[172]  Specifically, Plaintiff's grievance (and appeal) failed to notify

Defendant Duncan of an actual constitutional violation.[173]  Second, no evidence (or even non-

conclusory allegations) exist that Defendant Duncan created (or allowed to continue) a policy or

custom under which the alleged violation occurred, or that he was grossly negligent in managing

subordinates who caused that alleged violation.[174]

As a result, I recommend that the Court dismiss all of Plaintiff's claims against Defendant

Duncan regarding the collection of his urine sample, on the basis of lack of personal

involvement.

---

[171]     N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

[172]     *See*, *supra*, note 137.

[173]     (Dkt. No. 71, Parts 28-30 [Exs. A-C to Duncan Aff.].)  *See*, *supra*, Statement of Fact Nos. 17-24.

[174]     *See*, *supra*, Statement of Fact Nos. 17-24.

**2.      Whether Plaintiff Has Established an Equal Protection Claim
Regarding the Collection of His Urine Sample**

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

"deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend

XIV, § 1.  This "is essentially a direction that all persons similarly situated shall be treated alike."

*Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted).  "To prove an

equal protection violation, claimants must prove purposeful discrimination . . . directed at an

identifiable or suspect class."  *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citations

omitted).  In doing so, Plaintiff must demonstrate that "he was treated differently from similarly

situated members of other religions" or races.  *Jackson v. Mann*, 196 F.3d 316, 321 (2d Cir.

1999) (citations omitted).

Here, I find that Plaintiff has not established an Equal Protection claim regarding the

collection of his urine sample, for the reasons stated by Defendants in their memorandum of law

(Dkt. No. 71, Part 68 at 20-21 [Defs.' Mem. of Law]), which reasons are not specifically disputed

by Plaintiff in his opposition papers (Dkt. No. 77 [Plf.'s Response]).[175]

As a result, I recommend that the Court dismiss Plaintiff's Equal Protection claim

regarding the collection of his urine sample.

---

[175]      N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS
12285, at *27-31.

### 3.      Whether Plaintiff Has Established a Privacy Claim Regarding the Collection of His Urine Sample

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches . . . shall not be violated."  U.S. Const. amend IV. "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their discretion." *Skinner v. Ry. Labor Executives' Ass'n*, 109 S. Ct. 1402, 1411 (1989) (citations omitted). Generally, a prisoner's right to be free from unreasonable searches is somewhat diminished once he is incarcerated.  *Skinner*, 109 S. Ct. at 1414-15; *Bell v. Wolfish*, 441 U.S. 520, 556-57 (1979); *Roe v. Marcotte*, 193 F.3d 80-82 (2d Cir. 1999); *Harris v. Keane*, 962 F. Supp. 397, 407 (S.D.N.Y. 1997).  If a person's expectation of privacy is minimal, and the intrusion into the person's privacy is minimal, and there is a governmental reason advanced supporting a search, then the search will not violate the person's Fourth Amendment rights.  *Roe*, 193 F.3d at 77-80 (prisoner's DNA sample); *Harris*, 962 F. Supp. at 407 (prisoner's urine sample).  For example, under New York State regulations, corrections personnel may order an inmate to submit to a urine test based on a reasonable suspicion and based on information from a source that the inmate is using, or has recently used, illicit drugs or alcohol.  *Harris*, 962 F. Supp. at 407 (citing 7 N.Y.C.R.R. § 1020.4[a][1]).

_____Here, I find that Plaintiff has not established a Fourth Amendment privacy claim with regard to the collection of his urine sample, for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68 at 21-22 [Defs.' Mem. of Law]), which reasons are

not specifically disputed by Plaintiff in his opposition papers (Dkt. No. 77 [Plf.'s Response]).[176]

I would only add that Defendants' argument is supported by more than simply Paragraph 5 of

Captain C.F. Kelly's Affidavit (cited by Defendants).  *See*, *supra*, Statement of Fact Nos. 17-21,

23.

           As a result, I recommend that the Court dismiss Plaintiff's privacy claim regarding the

collection of his urine sample.

### 4.    Whether Defendant Duncan is Entitled to Qualified Immunity

     As discussed in above Part IV.A., "[o]nce qualified immunity is pleaded, plaintiff's

complaint will be dismissed unless defendant's alleged conduct, when committed, violated clearly

established statutory or constitutional rights of which a reasonable person would have known.'"

*Williams*, 781 F.2d at 322 (quoting *Harlow*, 457 U.S. at 815); *see also Richardson*, 5 F.3d at 621.

     Here, I find that Defendant Duncan is entitled to qualified immunity for the reasons stated

by Defendants in their memorandum of law (Dkt. No. 71, Part 68 at 22 [Defs.' Mem. of Law]),

which reasons are not specifically disputed by Plaintiff in his opposition papers (Dkt. No. 77

[Plf.'s Response]).[177]

     As a result, I recommend that the Court dismiss Plaintiff's claims against Defendant

Duncan on the basis of qualified immunity.

---

[176]     N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

[177]     N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

**D.      Plaintiff's Claim that He Was Subjected to Involuntary Servitude**

With regard to Plaintiff's claim that his Thirteenth Amendment right to be free from involuntary servitude was violated, Defendants argue that (1) Plaintiff has not established that he was subjected to involuntary servitude because the Thirteenth Amendment does not apply to punishment for a convicted crime, and in any event (2) Defendant Portunodo is entitled to qualified immunity.  (Dkt. No. 71, Part 68 at 22 [Defs.' Mem. of Law].)

**1.      Whether Plaintiff Has Established that He Was Subjected to Involuntary Servitude**

The Thirteenth Amendment states: "Neither slavery nor involuntary servitude, *except as punishment for crime whereof the party shall have been duly convicted*, shall exist in the United States, or any place subject to their jurisdiction."  U.S. Const. amend. XIII, § 1 (emphasis added). The Supreme Court has held "not all situations in which labor is compelled by physical coercion or force of law violate the Thirteenth Amendment.  By its terms the Amendment excludes involuntary servitude imposed as legal punishment for a crime."  *U.S. v. Kozminski*, 487 U.S. 931, 943 (1988).

Here, I find that Plaintiff has not established that he was subjected to involuntary servitude, for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68 at 23 [Defs.' Mem. of Law]), which reasons are not specifically disputed by Plaintiff in his opposition papers (Dkt. No. 77 [Plf.'s Response]).[178]

---

[178]      N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

_____As a result, I recommend that the Court dismiss all of Plaintiff's claims regarding involuntary servitude.

###     2.     Whether Defendant Portuondo Is Entitled to Qualified Immunity

As discussed above in Part IV.A.4., "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated *clearly established* statutory or constitutional rights of which a reasonable person would have known.'" *Williams*, 781 F.2d at 322 [emphasis added].

Here, I find that Defendant Portuondo is entitled to qualified immunity, for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68 at 23 [Defs.' Mem. of Law]), which reasons are not specifically disputed by Plaintiff in his opposition papers (Dkt. No. 77 [Plf.'s Response]).[179]

As a result, I recommend that the Court dismiss Plaintiff's claim of involuntary servitude against Defendant Portuondo on the basis of qualified immunity.

###     E.     Plaintiff's Claim that His Rights Were Violated by Defendants' Inspection of His Incoming Mail

With regard to Plaintiff's claims that his constitutional rights were violated in connection with the restriction of his incoming correspondence without due process, Defendants argue that (1) Plaintiff has not established a violation of either the First Amendment or a DOCS regulation, (2) Plaintiff has not established the personal involvement of Defendants Portuondo, Gorelick,

---

[179]     N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

Connolly, Horan, and Seger, and (3) in any event, Defendants Portuondo, Gorelick, Connolly, Horan, and Seger are entitled to qualified immunity.  (Dkt. No. 71, Part 68 at 24-26 [Defs.' Mem. of Law].)

### 1.   Whether Plaintiff Has Established a Violation of Either the First Amendment or a DOCS Regulation

Generally, the Supreme Court has upheld the constitutionality of restrictions on inmates' receipt of incoming correspondence and publications.  *See Thornburgh v. Abbott*, 490 U.S. 401, 412 (1989) (Federal Bureau of Prison regulations governing the receipt of subscription publications by inmates were reasonable related to legitimate penological interests); *Turner v. Safley*, 482 U.S. 78, 91 (1987) (Missouri rule barring inmate-to-inmate correspondence was reasonable related to legitimate security interests).  For example, a single occurrence of prison officials opening an inmate's *legal* mail (which is afforded greater protection than his non-legal mail) usually does not give rise to a constitutional claim.  *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citations omitted); *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986).  Rather, an inmate must show that prison officials "regularly and unjustifiably interfered with incoming legal mail."  *Davis*, 320 F.3d at 351 (citations omitted); *Gill v. Riddick*, 03-CV-1456, 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005) (Treece, M.J.) (citations omitted).  Moreover, when prison officials regulate incoming publications that are addressed to an individual inmate but targeted to a general audience, those officials are generally afforded broad discretion. *Thornburgh*, 490 U.S. at 412-13.  "Once in the prison, material of this kind reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct."  *Id*. at 412.

Here, I find that Plaintiff has not established a violation of either the First Amendment or a DOCS regulation, for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68 at 24-25 [Defs.' Mem. of Law]), which reasons are not specifically disputed by Plaintiff in his opposition papers (Dkt. No. 77 [Plf.'s Response]).[180]  I would add only one point.  At the time Plaintiff received the package (on March 8, 2002), several DOCS Directives were in effect regulating inmates' correspondence.  *See*, *supra*, Statement of Fact No. 37.  Regardless of the guarded approach that Shawangunk C.F. (and DOCS' Central Office) took with regard to Plaintiff's package from ACT, it appears clear to me that, under these DOCS Directives, the package could be opened, delayed, and indeed confiscated, given its nature and Plaintiff's status of confinement (in S.H.U.).  *See*, *supra*, Statement of Fact No. 38.

_____As a result, I recommend that the Court dismiss all of Plaintiff's claims regarding his incoming mail.

_____**2.**      **Whether Plaintiff Has Established the Personal Involvement of Defendants Portuondo, Gorelick, Connolly, Horan, and Seger**

As discussed above in Part IV.A.1., in the Second Circuit, a defendant's personal involvement in the alleged unlawful conduct is a prerequisite for a finding of liability in a Section 1983 action.  *See Wright*, 21 F.3d at 501; *McKinnon*, 568 F.2d at 934.

Here, I find that Plaintiff has not established the personal involvement of Defendants Portuondo, Gorelick, Connolly, Horan, and Seger, for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68 at 25-26 [Defs.' Mem. of Law]), which reasons are not

---

[180]      N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

specifically disputed by Plaintiff in his opposition papers (Dkt. No. 77 [Plf.'s Response]).[181]

_____As a result, I recommend that the Court dismiss Plaintiff's claims regarding his incoming mail against Defendants Portuondo, Gorelick, Connolly, Horan, and Seger on the basis of lack of personal involvement.

### 3. Whether Defendants Portuondo, Gorelick, Connolly, Horan, and Seger, Are Entitled to Qualified Immunity

As discussed above in Part IV.A.4., "[o]nce qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams*, 781 F.2d at 322 (quoting *Harlow*, 457 U.S. at 815); *see also Richardson*, 5 F.3d at 621.

Here, I find that Defendants Portuondo, Gorelick, Connolly, Horan, and Seger are entitled to qualified immunity for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68 at 26 [Defs.' Mem. of Law]), which reasons are not specifically disputed by Plaintiff in his opposition papers (Dkt. No. 77 [Plf.'s Response]).[182]

_____As a result, I recommend that the Court dismiss Plaintiff's claims regarding his incoming mail against Defendants Portuondo, Gorelick, Connolly, Horan, and Seger on the basis of qualified immunity.

---

[181]     N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

[182]     N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

**F.      Plaintiff's Claims Regarding the Review of His Disciplinary Hearing
Determination (Regarding His Refusal to Provide a Urine Sample) and His
Grievance (Regarding the Superintendent's Review of that Determination)**

With regard to Plaintiff's claims that his constitutional rights were violated in connection

with the review by Defendant Portuondo of Plaintiff's disciplinary hearing determination and

grievance, Defendants argue that (1) Plaintiff has not established a constitutional claim regarding

either the review of his disciplinary hearing determination or the review of his grievance, and (2)

in any event, Defendants Bisceglia, Maly, and Briggs are entitled to qualified immunity.  (Dkt.

No. 71, Part 68 at 26-29 [Defs.' Mem. of Law].)

**1.      Whether Plaintiff Has Established a Constitutional Claim Regarding
Either the Review of His Disciplinary Hearing Determination or the
Review of His Grievance**

I find that Plaintiff has not established a constitutional claim regarding either the review of

his April 16, 2002, disciplinary hearing determination or the review of his May 2, 2002,

grievance, for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68

at 26-29 [Defs.' Mem. of Law]), which reasons are not specifically disputed by Plaintiff in his

opposition papers (Dkt. No. 77 [Plf.'s Response]).[183]

_____As a result, I recommend that the Court dismiss all of Plaintiff's claims regarding the

review of his disciplinary hearing determination and the review of his grievance.

---

[183]      N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS
12285, at *27-31.

**2.      Whether Defendants Bisceglia, Maly, and Briggs Are Entitled to Qualified Immunity**

As discussed above in Part IV.A.4., "[o]nce qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams*, 781 F.2d at 322 (quoting *Harlow*, 457 U.S. at 815); *see also Richardson*, 5 F.3d at 621.

Here, I find that Defendants Bisceglia, Maly, and Briggs are entitled to qualified immunity, for the reasons stated by Defendants in their memorandum of law (Dkt. No. 71, Part 68 at 26-29 [Defs.' Mem. of Law]), which reasons are not specifically disputed by Plaintiff in his opposition papers (Dkt. No. 77 [Plf.'s Response]).[184]

As a result, I recommend that the Court dismiss Plaintiff's claim against Defendants Bisceglia, Maly, and Briggs regarding Plaintiff's disciplinary hearing determination and his grievance, on the basis of qualified immunity.

My conclusions regarding this claim are only strengthened by the fact that it appears that Plaintiff is barred from bringing the claim under the doctrine of collateral estoppel.  Specifically, it appears that Plaintiff already litigated (and lost) this claim in an Article 78 proceeding.  *See Jackson v. Goord*, 305 A.D.2d 839, 839-840, 758 N.Y.S.2d 558, 559 (3d Dept. 2003) (affirming the Albany County Supreme Court's dismissal of Plaintiff's Article 78 petition to review his disciplinary conviction for failing to comply with prison's urinalysis procedures).

---

[184]      N.D.N.Y. L. R. 7.1(b)(3); Fed. R. Civ. P. 56(e); *Beers*, 1999 U.S. Dist. LEXIS 12285, at *27-31.

ACCORDINGLY, it is

ORDERED that Plaintiff's cross-motion for an order compelling the depositions of

Defendants, an order granting sanctions against Defendants, and an order appointing counsel for

Plaintiff (Dkt. No. 77) is **DENIED** for three reasons: (1) Plaintiff's failure to show grounds for

the relief requested as required by Fed. R. Civ. P. 7(b)(1) and Fed. R. Civ. P. 37; (2) Plaintiff's

failure to show good cause to modify the discovery deadline and non-dispositive motion deadline

set forth in this matter's Pretrial Scheduling Order of January 14, 2003 (Dkt. No. 25)[185] as

required by Fed. R. Civ. P. 16(b)(6); and (3) Plaintiff's failure to comply with Local Rules

7.1(a)(2), 7.1(b)(2), 7.1(b)(3), and 7.1(d) of the Local Rules of Practice for this Court; and

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 71) be

**GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within

which to file written objections to the foregoing report.  Such objections shall be filed with the

Clerk of Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Svcs.*, 892 F.2d 15 [2d Cir. 1989]); 28 U.S.C. §

636(b); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: October 11, 2005
        Syracuse, New York

George H. Lowe
United States Magistrate Judge

---

[185]     In particular, I note that the discovery deadline in this matter expired on July 30,
2003, and the deadline for motions to compel expired on August 30, 2003, with no extensions
requested by, or granted to, Plaintiff.  (Dkt. No. 25 at 2 [Pretrial Scheduling Order]; Dkt. No. 41.)